UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 15-49 (02) (MJD/FLN)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **SENTENCING POSITION OF THE** |
| v. | ) | **UNITED STATES OF AMERICA** |
| | ) | |
| MOHAMED ABDIHAMID FARAH, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, through its attorneys, Andrew M. Luger, United

States Attorney for the District of Minnesota, and Assistant United States Attorneys John

Docherty, Andrew R. Winter, and Julie E. Allyn, respectfully submits its Sentencing

Position in this case.  After consideration of all the facts of this case, as well as the United

States Sentencing Guidelines (hereinafter the "U.S.S.G."), and the factors set forth at Title

18, United States Code, Section 3553(a), the United States believes that a sentence of thirty

years' imprisonment, followed by a lifetime of supervised release, is sufficient, but not

greater than necessary, to achieve justice in the sentencing of this defendant.

## I.      INTRODUCTION

Following a three-defendant jury trial of over three weeks, defendant Mohamed

Abdihamid Farah was convicted of all six federal felonies with which he was charged in

the Second Superseding Indictment (Docket No. 292):  Count One, Conspiracy to Murder

Outside the United States, in violation of 18 U.S.C. § 956; Count Two, Conspiracy to

Provide Material Support to a Designated Foreign Terrorist Organization (ISIL), in

violation of 18 U.S.C. § 2339B; Count Five, Attempting to Provide Material Support to a Designated Foreign Terrorist Organization (ISIL), in violation of 18 U.S.C. § 2339B; Count Six, Attempting to Provide Material Support to a Designated Foreign Terrorist Organization (ISIL), in violation of 18 U.S.C. § 2339B; Count Nine, Perjury, in violation of 18 U.S.C. § 1621; and Count 12, False Statement, in violation of 18 U.S.C. § 1001.[1]

The evidence at trial showed a large, long-term conspiracy that contained within it three distinct efforts by the conspirators to reach Syria, where they would join, and fight for, ISIL – one attempt in the Spring of 2014 which resulted in two travelers reaching Syria, while a third traveler was denied boarding at the airport by law enforcement; a second attempt, in the Fall of 2014, in which five travelers, one of whom was defendant Mohamed Farah, tried to reach Syria, but all were denied boarding at either Minneapolis – Saint Paul International Airport or John F. Kennedy International Airport in New York City; and a third and final attempt, in the Spring of 2015, in which two conspirators, one of whom was defendant Mohamed Farah, tried to reach Syria via Mexico by driving to San Diego, California, to buy fake passports, planning to use those fake passports to cross into Mexico, from where they would make their way to Syria.  This third attempt was unsuccessful, and

---

[1] By the time of trial, several of the defendants named in the Second Superseding Indictment had entered negotiated pleas of guilty.  In order to prevent jury confusion, a special form of indictment was prepared for the jury.  In the indictment prepared for the jury, counts which named only those defendants who had pled guilty were removed.  The counts of the indictment were then re-numbered, to avoid gaps in the numerical sequence of counts. Finally, the Second Superseding Indictment was renamed, simply "Indictment" for the jury's sake.  The counts set forth in this Sentencing Position, and indeed, all references to a charging document, are to the Second Superseding Indictment, and not to the jury-only special form of indictment.

resulted in the arrest of six of this case's defendants, one of whom was defendant Mohamed Farah.

A detailed recitation of the facts of the case can be found in Common Appendix A, which is attached to this Sentencing Position, and in the "Offense Conduct" section of the Report of Presentence Investigation prepared by the United States Probation and Pretrial Services Office.  The evidence at trial showed defendant Mohamed Farah was a full and willing participant in all three efforts made by the conspirators to reach Syria and join ISIL.

Several men from Minnesota have died in Syria as a result of the conspiracy of which defendant Mohamed Farah was a part.  Other men from Minnesota have reached Syria, and are now active members of ISIL, a dangerous international terrorist organization which threatens the national security of the United States.  The defendant lied to law enforcement, he lied to the grand jury, and, in the self-serving letter which he has submitted to the probation office in advance of sentencing, he has continued to lie about his conduct and his motivations.  To protect the public from the danger which the defendant poses, to provide just punishment, and to deter others from joining foreign terrorist organizations, the thirty-year sentence recommended by the government is appropriate.  That term of imprisonment should be followed by supervised release for the rest of defendant Mohamed Farah's life.

## II.     THE FACTS OF THE CASE AGAINST DEFENDANT MOHAMED FARAH

As noted, the evidence at trial showed that defendant Mohamed Farah was a full, willing (indeed enthusiastic) member of this conspiracy, who was highly motivated to go

to Syria, join ISIL, and perpetrate violence on that terrorist organization's behalf. The evidence against defendant Mohamed Farah consists mainly of the testimony of cooperating witnesses at trial, and of conversations which defendant Mohamed Farah himself participated in when he thought his words were not being recorded.

### A. Defendant Mohamed Farah's Participation in the Conspiracy During the Spring of 2014

Cooperating defendant Abdullahi Yusuf (hereinafter "Yusuf") testified at trial that in the spring of 2014, he joined a group of men who met and made plans to travel to Syria to join, and fight for, ISIL. Yusuf testified that at the very first conspiratorial meeting he attended, it was defendants Mohamed Farah and Zacharia Abdurahman who pulled up videos about Syria on their iPad or phone. (Yusuf Tr. 5/13/16 p. 49).[2] The group planned travel to Syria in meetings that were held about three times per week (Yusuf Tr. 5/13/16 p. 90) and at almost all of these meetings the topic of fighting in Syria came up. (Yusuf Tr. 5/13/16 pp. 90 - 91).

Defendant Mohamed Farah participated in discussions about the practicalities (money, routes, etc.) of getting to Syria, and, because defendant Mohamed Farah believed he was "hot" (under scrutiny by law enforcement) (Yusuf Tr. 5/13/16 pp. 80-81), he did not think he could fly from an airport. Therefore, defendant Mohamed Farah's plan for

---

[2] Trial transcripts are formatted with the last name of the witness, followed by the date of their testimony, followed by page numbers for the transcript of that witness, on that date. The transcript cite which accompanies this footnote, "Yusuf Tr. 5/13/16, p. 49" therefore indicates a cite to page 49 of the transcript of the May 13, 2016 trial testimony of cooperating defendant Abdullahi Yusuf. At this time, the testimony of only a few witnesses has been transcribed, and therefore, not all factual assertions in this Sentencing Position are accompanied by transcript cites.

reaching Syria involved driving a rental car to California and going through Mexico, at which point defendant Mohamed Farah would "take a flight out of Mexico to avoid U.S. airports and get to Syria that way."  (Yusuf Tr. 5/13/16 p. 82).  Because he was enrolled in a post-secondary educational institution, defendant Mohamed Farah also discussed, together with co-conspirators Zacharia Abdurahman, Abdirizak Warsame, Abdi Nur, and Guled Omar, obtaining federal educational financial aid, then taking the money out of the financial aid account, and using it to finance travel to Syria.  (Yusuf Tr. 5/13/16 p. 84). Although defendant Mohamed Farah did not follow through on this money-raising plan, defendant Guled Omar did, and was convicted of doing so following trial.  There was also evidence presented at trial, in the form of documents recovered from a blue Volkswagen Jetta, that defendant Abdi Nur had also financed his travel with student financial aid. Defendant Hamza Ahmed also pled guilty to student financial aid fraud.

Another of the practicalities of traveling to Syria was finding a way to communicate without potentially being overheard.   Defendant Mohamed Farah took part in a conversation with defendants Guled Omar and Abdirahman Daud about downloading a secure communications app called "Surespot," and using that app to communicate about the conspiracy because, when it came to Surespot "the Feds didn't know about it."  (Yusuf Tr. 5/13/16 pp. 85- 86).

Based on his conversations with defendant Mohamed Farah, Yusuf believed that defendant Mohamed Farah understood that when he arrived in Syria he, defendant Mohamed Farah, would be killing people.  (Yusuf Tr. 5/13/16 p. 91)

### B. Defendant Farah Helped Yusuf Prepare for Yusuf's Attempt to Travel to Syria in the Spring of 2014.

Defendant Mohamed Farah was extensively involved in assisting Yusuf with Yusuf's preparations for travel to Syria in the spring of 2014.  Mohamed Farah's help to Yusuf included helping him with the paperwork necessary for a passport, and providing transportation to and from the passport office (Yusuf Tr. 5/13/16 p. 108); calling Yusuf's school pretending to be Yusuf's father so as to excuse Yusuf from class so that Yusuf could go and collect his passport (Yusuf Tr. 5/13/16 p. 112); accompanying Yusuf as Yusuf deposited into a newly-opened bank account cash Yusuf had obtained from Yusuf Jama with which to finance his trip to Syria (Yusuf Tr. 5/13/16 pp. 141 and 145-146); shopping with Yusuf and Nur the night before Yusuf's attempted departure (Yusuf Tr. 5/13/16 pp. 160 – 161; and, as will be discussed more below, covering up by lying to the grand jury investigating ISIL recruitment in the Twin Cities.

Mohamed Farah found himself unable to travel to Syria in the Spring of 2014, however, because, to prevent their travel, family members seized the passports of both defendant Mohamed Farah, and the passport of his younger brother and co-defendant, Adnan Farah (Yusuf Tr. 5/13/16 pp. 129 – 131).

### C. Defendant Mohamed Farah Continued to Plot, and to Enthusiastically Watch ISIL Propaganda Videos Containing Disturbing Scenes of Extreme Violence and Cruelty

During the summer of 2014, defendant Mohamed Farah and his co-conspirators maintained contact via social media with ISIL fighters operating inside Syria and Iraq.  As ISIL expanded its territory in Syria and Iraq through successful attacks and military

campaigns in 2014, the terrorist organization simultaneously flooded the internet with its violent propaganda.  The trial evidence established that defendant Mohamed Farah avidly consumed this propaganda.   All three cooperating witnesses (Abdirahman Bashir, Abdirizak Warsame, and Yusuf) identified defendant Mohamed Farah as a member of the conspiracy who they knew to watch and discuss ISIL propaganda videos. See, e.g., Bashir 5/19/16 pp. 53-54 (Bashir knew defendant Mohamed Farah to watch "On the Prophetic Methodology"); Warsame Tr. 5/24/16 p. 64 (Warsame knew defendant Mohamed Farah to listen to Anwar al-Awlaki propaganda tapes) and 65 (Warsame discussed "Flames of War" with defendant Mohamed Farah); Yusuf Tr. 5/13/16 p. 49 (defendant Mohamed Farah is one of two individuals (Zacharia Abdurahman is the other) who watches ISIL propaganda videos on his electronic device the very first night that Yusuf meets the group at Dar al-Farooq Bloomington).  Later, as described in detail below, Mohamed Farah himself openly and quite favorably discussed ISIL videos while being recorded by Bashir.

One of the ISIL propaganda videos defendant Mohamed Farah watched was, "Upon the Prophetic Methodology," in evidence as Government Exhibit 178.   Released in the summer of 2014, this video graphically displayed ISIL's mass executions of young Shi'a men at an Iraqi Security Forces recruitment center, after the town of Tikrit was overrun by ISIL.  Accompanied by a soundtrack of jihadi nasheeds, the video depicts the execution of hundreds of young men as they lie on the ground with their hands bound behind their back. Truckloads of the Shi'a victims are filmed begging for their lives, forced to denounce Iraqi political leaders, only to be marched to an open ditch where they are shot in the head as ISIL's ubiquitous black flag flaps in the wind strategically within the camera's view.  At

the close of this video, dozens of other victims are paraded to the edge of the Tigris river, unceremoniously shot in the head, and their corpses are then pushed into its waters.  In the following transcript of a recorded conversation from April 3, 2015, defendants Mohamed Farah and Zacharia Abdurahman discussed a virtual play-by-play of this video:

> ZA:    How about when Dawlah [ISIL] took over the training camp?  And {the river}.
>
> **MF:  Oh, man!**
>
> ZA:    The video, [UI][3]
>
> **MF:  Subhanallah.**
>
> ZA:    Abu Israfil.  That's why he's like, "[w]e are going to get revenge in Tikrit."  For the, that's where they got killed, Tikrit.
>
> **MF:  Oh that's, that's where the bodies went!**
>
> ZA:    {Martyrs}[4] [UI] something like that….
>
> **MF:  A thousand [UI]**
>
> ZA:    A thousand in the training camp, {all of them}, one by one.
>
> **MF:  [singing] {Allah is great.  [OV] Victory is certain}**
>
> ZA:    You didn't see the whole video?
>
> **MF:  I know, remember.**
>
> ZA:    And then the last guy he killed, [gun noise] and he just walked away.

---

[3] Material in square brackets explains the sounds on the tape, for example [UI] for "unintelligible" or [OV] for "overlapping voices."
[4] Material in curved brackets has been translated into English from a foreign language, usually either Somali or Arabic.

**MF:**   **[Laughs] That was so hard core wallahi.  Wallah, that's some hard-core stuff, wallah.**

**ZA:**   **{The mother of all believers, Aisha}** [5]

**MF:**   **[Laughing]**



**An unknown Iraqi Shi'a military recruit begs for his life shortly before he is murdered by ISIL.  This screenshot is from the video at time 33:14 in Government Exhibit 178, ISIL Propaganda Video "On the Prophetic Methodology."  This is the video whose memory reduced defendant Mohamed Farah to laughter.  In the right center of the picture, a man is removing a ring from his finger.  In the next few seconds of the video he is seen offering the ring to an ISIL guard, perhaps in the hope that in exchange for this valuable, his life will be spared.**

---

[5] Bashir testified that this phrase is lifted directly from the video, where it is uttered just before the executions.

ZA:   [Makes noise of a gun firing] {The river}

**MF:   {Glory to god}, and then you see their blood.**

CHS:   Nigga, that was a, that was a scary movie scene, nigga.  [OV][UI].  You know all the Western, you know what they are saying?   [ISIL is] playing psychological war with the Shi'a.

**MF:   Of course.**

CHS:   'Cuz of that nigga . . . that was deadly.  That whole river is bodies and blood.

**MF:   No . . . you know what . . . uh . . .**

CHS:   They went to the Shi'a

**MF:   Baghdad**

CHS:   It was psychological

**MF:   Walahi, that's some crazy stuff!**

ZA:   There was like hundreds of dead bodies, and then the last guy.[6]

---

[6] Trial exhibits 232 (audio) and 233 (transcript), at pages 121-122.



At time mark 34:04 of Government Exhibit 178, ISIL executioners systematically murder unarmed Shi'a prisoners by shooting them in the head with automatic infantry assault rifles.



Another screen shot from Government Exhibit 178, this one at time mark 35:26. An unarmed Shi'a prisoner is about to be shot in the head by a hooded, pistol-wielding ISIL executioner. This is "the river" to which defendant Mohamed Farah referred in the tape-recorded conversation of April 3, 2015, in evidence as Government

**Exhibits 232 (audio) and 233 (transcript).  Defendant Mohamed Farah's statement "{Glory to God} and then you see their blood" may be a reference to the stone visible at the very bottom of the screen, which is slick with the copious amounts of blood already spilled by prisoners who were shot earlier.  Note the masked man in the foreground carrying an ISIL flag.**

During the summer of 2014, defendant Mohamed Farah, together with many other members of the conspiracy, worked at a private mail and package facility in Mendota Heights through a temporary employment agency.  During their time at that job, defendant Mohamed Farah and his coconspirators talked about their plans to go to Syria to join ISIL. (Bashir Tr. 5/19/16 p. 62.)  This job was not merely a means of earning a paycheck, it was an integral part of the plot to go to Syria to join ISIL.  In one recording defendant Guled Omar reminisced with defendant Abdurahman, stating "[w]hen we were working at [name of the staffing service] everything was going perfect…We were working, the kuffar [non-believers; heretics] were not, they didn't even know we worked together, they didn't even know nothing, bro." [7]  CHS Bashir testified that he and other members of the conspiracy discussed plans to travel to Syria while processing mail, while on break, and when they went outside the mail facility to pray.  Further, the men discussed the fact that they needed to save up money from their mail and package jobs to "cut their tickets to Turkey" (Bashir Tr. 5/19/16 p. 62).

In an April 3, 2015 CHS recording, defendant Mohamed Farah, co-defendant Daud, and Bashir reminisced about the time they spent together at the mail and package facility during 2014.  Both defendants Mohamed Farah and Daud confirmed that they used their

---

[7] Trial exhibits 232 (audio) and 233 (transcript), at page 205.

electronic devices to watch ISIL propaganda while getting paid by the staffing service to process mail and packages.  Defendant Farah specifically referenced a time that he watched the ISIL video "Flames of War" in the men's room at work but was interrupted by his supervisor:

> **MF:**   **[OV] You know-you know the bald guy that they—she said, uh, was going to take over the place?**
>
> AD:   Yeah.
>
> **MF:**   **That guy came walking to me, and I think I was, uh, watching the video. *Flames of War*.   …I was sitting on, uh, the wooden place—uh—the shower place.**
>
> AD:   In the bathroom?
>
> **MF:**   **…I was, "Damn, I'm waiting for an email.  It's ta-it's taking awhile for me to… He's, "All right, take your time.  Take your time."**
>
> AD:   [laughs]
>
> **MF:**   **Oh, got away with it.**
>
> AD:   [OV] That wooden place. {Me, I used to chill out}
>
> CHS:   [OV] He opened the door?
>
> **MF:**   **[OV] He opened the door on me, because I forgot to lock it.**
>
> CHS:   [OV] Were you [going to the bathroom]?
>
> **MF:**   **No, no.**
>
> CHS:   What?

**MF:   I was watching "Flames of War." [Laughter].** [8]

"Flames of War," in evidence as Government Exhibit 181, highlights ISIL's seizure of a Syrian military installation near Raqqah.  In this video, captured Syrian soldiers are filmed digging their own graves, being mocked and jeered at as they do so, being murdered by a shot in the head, then falling into the ditches.  The narrator explains ISIL's version of events, namely, that they are merely establishing Allah's law while being attacked by the West, by Assad, and by other enemies.

### D.  Defendant Mohamed Farah Lies to the Grand Jury

Defendant Mohamed Farah perjured himself when he testified before a grand jury of this district about the Spring of 2014 plot.  The grand jury was investigating recruiting by ISIL in the Twin Cities.  At trial, defendant Mohamed Farah was convicted of perjury for lying before the grand jury about his communications with Abdi Nur before Abdi Nur left for Syria and ISIL. The perjury count against defendant Mohamed Farah is Count Nine of the Second Superseding Indictment (Docket No. 292), and Count Seven of the Indictment prepared for the jury's use during trial (Attachment One to Docket No. 496). Defendant Mohamed Farah's lies under oath about the Spring of 2014 plot encompassed far more than the perjury count of conviction, however.

On September 22, 2014, defendant Mohamed Farah appeared before a grand jury of this district pursuant to subpoena.  The transcript of that testimony was introduced at trial

---

[8] Trial exhibits 232 (audio) and 233 (transcript), at pages 205-206.

14

as Government Exhibit 339.  At page 16 of that transcript, the following exchange
occurred:

Q  What was the nature of your last communication with Abdi Nur?

A  You want to hang out and go play ball?

Q  Did you end up hanging out and playing ball with him?

A  Yeah.

Q  And after that time in early May, you haven't seen him or talked to him since?

A  No.

Defendant Mohamed Farah knew this answer was completely false.  The evidence
demonstrated that throughout May of 2014, he spent significant time with Nur and others
conspiring to travel overseas to join ISIL.  The evidence included a Macy's department
store surveillance video showing defendant Mohamed Farah shopping with Nur and Yusuf
on May 27, 2014 – one night before Yusuf attempted to leave and two nights before Nur
successfully left Minneapolis for Syria. (Two clips from the Macy's in-store surveillance
video were introduced at trial.  They are Government Exhibit 50 and Government Exhibit
51).  The jury convicted defendant Mohamed Farah of perjury because of his lies in the
exchange quoted immediately above.

The materiality of defendant Mohamed Farah's lies cannot be overstated.  Had
Farah answered truthfully, the grand jury would have been in a position to better assess the
scope of the conspiracy, including defendant Mohamed Farah's role in planning and in
aiding his co-conspirators' travel to join ISIL.  By denying conspiratorial contact with Nur
during this critical time, Farah avoided inculpating Nur, avoided inculpating himself, and

avoided inculpating other members of the conspiracy involved in the on-going plot to join, fight and kill for ISIL.

Defendant Mohamed Farah's false testimony, however, was not limited to lies about Nur.  Defendant Farah also falsely testified that he did not use Facebook (Trial Exhibit 339 at page seven), that he never used Kik to communicate with anyone overseas (Trial Exhibit 339 at page 10), and that he did not speak with Yusuf after Yusuf was stopped by the FBI at MSP on his way to Istanbul (Trial Exhibit 339 at page 16).  Further, he lied when he claimed not to remember going shopping with Abdi Nur and Abdullahi Yusuf at Southdale (Trial Exhibit 339 at page 21) and he lied when he testified that he does not speak Somali (Trial Exhibit 339 at page six).

Defendant Farah would later admit on tape that he lied to the federal grand jury.  In the following excerpt from April 8, 2015, Farah described what he told the grand jury in response to questions about any contact with Nur and he candidly explained why he lied to the grand jury:

MF:   Well, I said, "Hell no," to Abdi. Everybody that had a subpoena said, "Hell no."

ZA:   {Who? What?}

MF:   H-"when's the last time you talked to Abdifatah [Nur]?"  "Shit when he was here man."  "So you never talked to him through anything. Kik, Facebook, Twitter?" "No."

ZA:   Do they know about Kik?

MF:   If they knew about Kik we'd all be arrested for—everybody, Guled, {everyone.}[9]

### E. Defendant Mohamed Farah Participates in the Fall of 2014 Plot by Traveling to New York, and by Lying About His Activities when Caught

*...but I'm going to tell you one thing though, man.   When I went...on that...Greyhound...wallah, it was the best feeling in my life."* – Defendant Farah, CHS recording on March 23, 2015[10]

With these words, defendant Mohamed Farah sums up his feelings about his attempt to travel to Syria to join ISIL in the Fall of 2014.   Defendant Farah and three other defendants all traveled on Greyhound buses to New York City's John F. Kennedy International Airport, where they intended to catch flights to various cities in southeastern Europe, such as Athens, Greece and Sofia, Bulgaria.   As defendant Mohamed Farah put it, getting on the Greyhound to go to New York so that he could travel to Syria to join, and fight for, ISIL, "was the best feeling in my life."[11]

On the morning of November 8, 2014, the four JFK travelers arrived in New York City.   They logged on to their portable devices and, often within minutes of each other, purchased their airline tickets for departures that were scheduled to occur just a few hours in the future.

---

[9] Trial Exhibits 241 (audio) and 242 (transcript) at page 120.
[10] Trial Exhibits 214 (audio) and 215 (transcript) at page 195.
[11] Trial Exhibits 214 (audio) and 215 (transcript) at page 195.

Alerted to the potential travel of these defendants, FBI Agents in Minneapolis communicated with their colleagues in New York.  Before he could board his flight, defendant Mohamed Farah was stopped by federal law enforcement agents.

After he was denied boarding, defendant Mohamed Farah was interviewed by FBI agents on the sidewalk outside JFK's Terminal 1.  Like many of his co-conspirators, he lied to law enforcement, telling them that he was traveling alone to Bulgaria for a one-day vacation, and further claimed to not know his three co-travelers.   The four travelers then went to the Port Authority bus terminal in Manhattan and returned to Minnesota the same way they had left, on Greyhound buses.

When defendant Mohamed Farah arrived back in the Twin Cities from New York after being thwarted in his effort to go to Syria and join ISIL, he was given a target letter and later served with a grand jury subpoena.  Through counsel, Farah requested an interview in lieu of another grand jury appearance.  The U.S. Attorney's Office agreed to this, and the interview took place on January 22, 2015, in a U.S. Attorney's Office conference room in the Minneapolis courthouse.  Defendant Mohamed Farah was accompanied by defense counsel and his father.   In the approximately 45-minute long interview, he once again lied profusely about his and his coconspirators' activities surrounding the failed attempt to travel through JFK.  The defendant was told repeatedly by interviewing agents and an Assistant U.S. Attorney that they believed he was lying about the November attempt to travel overseas.  Despite multiple opportunities to correct the record, defendant Mohamed Farah persisted tenaciously in making false statements to the agents and AUSA.

On March 23, 2015, defendant Mohamed Farah was recorded discussing the failed November 8, 2014 plot to join ISIL by traveling through JFK.  In the same conversation in which he made the "best feeling in my life" statement quoted above, defendant Mohamed Farah also described getting stopped by the authorities at JFK:  "…they looking at my stuff they're all 'we're going to make a phone call.' {My heart stopped.} I said, 'Damn.'  I kept making {prayer} to Allah.  Make a barrier between {hide me, hide me.}   And they're like,'...whoa, I'm afraid we can't let you go.'" [12]  Farah then described lying to the FBI agents during the interview at JFK.

### F.  As 2015 Arrived, Defendant Farah Continued Making Plans to Join ISIL, and Tried to Justify ISIL's Burning Alive of a Captured Jordanian Air Force Officer.

*"Uh, is it me, Zach and Hanad, every freaking day, since November, we're like, yo, get your money up.  Get your money up.  Get your money up."  Defendant Mohamed Farah, 4/3/15* [13]

Despite the failure of the November 2014 JFK attempt and the ensuing intervention by the FBI, defendant Mohamed Farah did not wait to plot another attempt to join ISIL.  Within days of the FBI interview, defendant Mohamed Farah met with his co-conspirators at the Dar al-Farooq Como mosque to discuss the status of their criminal efforts.  Bashir testified that the group discussed how they were sent back from New York City, what they should have done differently (they thought they should have split up the foursome, with two travelers leaving from Milwaukee and two from Boston), and what to do in the future,

---

[12] Trial exhibits 214 (audio) and 215 (transcript) at page 197.
[13] Trial exhibits 232 (audio) and 233 (transcript) at page 306.

including – at co-defendant Zacharia Abdurahman's suggestion – reducing their visible footprint on the internet.  (Bashir Tr. 5/19/2016 p. 114).

In December 2014, Flight Lieutenant Moaz al-Kasasbeh of the Royal Jordanian Air Force was shot down over Syria while participating in airstrikes against ISIL targets.  In a sickening scene of brutality, ISIL, around February 3, 2015, put Flight Lieutenant Kasasbeh in a cage, soaked him in a flammable liquid, and burned him alive.  ISIL then used a front-end loader to drop a load of rubble on the pilot's body.  ISIL videotaped Flight Lieutenant Kasasbeh's excruciating death, and posted the video to the internet.

Defendant Mohamed Farah thought this was great, and theologically justified to boot, as seen in the following extract from Government Exhibit 188, the transcript of a February 13, 2015, recorded conversation:

CHS:  Yeah, wallah, I still don't get it right now.  I realized, What the hell?  …Why did they burn him?

**MF:  It's *qisas* ["revenge"].**

CHS:        Yeah?

**MF:  It's *qisas* ["revenge"] .**

CHS: But does—isn't there a hadith —

**MF:  Yeah.**

**MF:  Abu Bakr, Abu Bakr, {may God be pleased with him.}**

CHS:  --that says you can't burn anyone with fire?

**MF:  Abu Bakr…**

CHS:  Real talk, nigger.  Ain't no qisas. ["revenge"]

20

**MF:  Wallah, it is.**

CHS:  That was a mistake nigga.

**MF:  It's not**

CHS:  It is.  Yeah.

**MF:  Abu Bakr, {may God be pleased with him}, when he was fighting the apostates, he burn, burned most of them.  Did you know that?**

CHS:  Hell no.

**MF:  Wallahi [I swear to god].**

CHS:  Never seen that in my life.[14]

---

[14] Trial exhibits 187 (audio) and 188 (transcript)at pages 5 and 10.



**At the 24 second mark of Government Exhibit 352, Flight Lieutenant Moaz al-Kasasbeh of the Royal Jordanian Air Force is seen in a cage, moments before being burned alive. The flammable liquid in which the lieutenant has been doused is visible in the darkening of some areas of his orange jump suit. A front end loader, its bucket filled with heavy, stone rubble, can be seen ready and waiting in the background.**

Later in this same recording, defendant Mohamed Farah returned to the topic of the burning of Flight Lieutenant al-Kasasbeh. Defendant Mohamed Farah again defended the act of burning the lieutenant alive, and tried to explain the symbolism used by ISIL in its video. All of the brutality inflicted, according to defendant Mohamed Farah, is permissible under the teachings of Abu Bakr.

Defendant Mohamed Farah would yet again defend the pilot's immolation in an entirely different conversation two months later. On April 3, 2015, defendant Mohamed Farah spoke with an unindicted individual ("RW") and Bashir. In this recording, RW

referred to a time in the past when he had argued against ISIL's execution of prisoners. RW then told the group that he had been wrong to argue against the murder of prisoners because he had thereafter discovered an '*ayat*' instructing him that "you have to freaking kill all of them!"   It was here that Mohamed Farah interjected that it was he, Mohamed Farah, who spoke of the *ayat* mandating the execution of all prisoners: "I dropped that Hadith on you!  I dropped that evidence on you!"   The group then proceeded to discuss the concept of offensive versus defensive jihad.  Defendant Farah stated that once a battle is over, the Amir had the discretion to kill all prisoners.  When Bashir then referenced Abu Bakr, defendant Mohamed Farah stated, "he was like 'burn him!'  Wallahi.  That's my A-1."[15]

### G. Mohamed Farah's Participation in the Spring of 2015 Plot to Join ISIL

*"Yeah, I'm going to go jail. I don't care."* Defendant Mohamed Farah, on March 23, 2015.[16]

*"There is no regret in life. I don't see anything wrong with this. ... To race to Allah, {Glorious be He}, to make Allah's work the most high.  There is nothing more honorable than that bro… Wallahi, if I get arrested} before it comes, {thanks to Allah}, I know what I have to do inside… Book your ticket to {heaven}."*  Defendant Mohamed Farah, on April 3, 2015[17]

---

[15] Trial exhibits 232 (audio) and 233 (transcript) at pages 77 – 79.
[16] Trial exhibits 214 (audio) and 215 (transcript), at page 62.
[17] Trial exhibits 232 (audio) and 233 (transcript) at page 82.

"*They don't think we have that kind of balls. These guys think the most we'll do is fricking, fly from a different state... They don't know {that we are all smart}. They don't have brain capacity. They think someone is recruiting us…They think someone is giving us money. They don't know {all of this right now}. When they find out, {we had the money, gave it out and planned all this} they're going to fricking explode, when ...the real truth comes out."* Defendant Mohamed Farah, on April 3, 2015 [18]

"*{If they write books about martyrs and stuff} they'll read about our stories. [Chuckles] Damn, wallahi, Illahi, may Allah make it true."* Defendant Mohamed Farah, on April 3, 2015 [19]

In the Spring of 2015 defendant Mohamed Farah, as the four quotations above demonstrate, was still firmly determined to join ISIL. In that Spring defendant Mohamed Farah conspired with his co-defendants to obtain fake passports for use in crossing the U.S. border into Mexico. From Mexico, the conspirators intended to fly to Turkey, cross into Syria and join ISIL. From February 12 until April 19, 2015, Abdirahman Bashir, now a cooperating individual, recorded dozens of hours of conversation with defendant Mohamed Farah and his co-conspirators as their newest plot to join ISIL developed.

Despite having stolen his passport back from his grandmother in 2014 to make his November attempt, defendant Mohamed Farah went to her in February of 2015 to enlist her support to help him try again. In a conversation on April 8, 2015, which was recorded by Bashir, defendant Mohamed Farah described a conversation with his grandmother in

---

[18] Trial exhibits 232 (audio) and 233 (transcript), at page 87-88.
[19] Trial exhibits 232 (audio) and 233 (transcript), at page 92.

which he told her he was leaving the country and had asked her for financial support to do so: "I told my grandma I want [UI] I said that's the only option. {A while ago,} like February and then he dropped me off at my grandma's house, I talk {'dear, I've found some guys and I want to leave this place, so give me some money.' She said 'ok we will talk about it as family'} How [is] she gonna tell her daughter? (Laughs). They talk about everything, you know.  Then, my mom came to me.  {She said 'what's going on, I'm hearing that you are leaving on the low.'}  They just pieced stuff together."[20]

As defendant Mohamed Farah's words made clear, the request to his grandmother resulted in Farah's mother learning that he was once again plotting to leave the U.S.  But according to the defendant, this was not a new revelation to his mother.  Rather, defendant Mohamed Farah's own statements show that his mother knew about his radical views and his plans to travel overseas to fight jihad.

Defendant Mohamed Farah confirmed that his mother has known about his radical views since his early high school years.  This fact is evidenced by his April 9, 2015, statement to Bashir, recalling that "I listened to that [jihad nasheed]…freaking tenth grade or ninth grade…used to listen to everything. On my computer {I mean}. Wallah man. My mom, one day {she caught me watching that stuff} videos, {right.}"[21]   In an earlier recording, defendant Mohamed Farah discussed the fact that his mother had, at one time, thought he had been brainwashed but that "she realized now that nobody [has] brainwashed

---

[20] Trial exhibits 241 (audio) and 242 (transcript), at page 170.
[21] Trial exhibits 241 (audio) and 242 (transcript), at page 165.

me and it's all about me." [22]   Farah even suggested that his mother could calm Musse's father down because he [Musse's father] had recently learned about the spring 2015 plot: "I don't know about Hanad,…about his parent.  I don't know what his dad would do.  If he hits up my mom and she calms him down, [then] he's chilling."[23]  Driving home the point to Daud, defendant Mohamed Farah assured him that his mother will stay silent: "one hundred percent, wallah, she won't say squat." [24]

On the eve of their departure to San Diego, defendant Mohamed Farah would assure fellow traveler Daud that despite his mother's knowledge of their plans to travel to Syria, she would not do anything to stop them:

MF:   [OV] My mom [UI] she knows, bro.

AD:   You know how I am talking about? She came to me and she said, I am locking you up right now. Tell me where Adnan is. I don't care about Mohamed Farah.

CHS:  [OV] Okay. Are you gonna be there for that time again?

AD:   No, I am saying, dude . . . I'm--we not gonna be there. But is this Adnan--

MF:   [OV] She knows where I am going.

AD:   Yeah, she knows where this guy is going…

MF:   She knows where I am going, bro…[25]

---

[22] Trial exhibits 232 (audio) and 233 (transcript) at page 424.
[23] Trial exhibits 232 (audio) and 233 (transcript) at page 425.
[24] Trial exhibits 232 (audio) and 233 (transcript) at page 425.
[25] Trial exhibits 251 (audio) and 252 (transcript) at page 27.

### H. Defendant Mohamed Farah Drives Cross-Country to Obtain His Fake Passport; the Spring of 2015 Plot

On April 17, 2015, Farah, Daud, and Bashir left Minneapolis for San Diego. As they drove west, thinking they were going to pick up their fake passports, defendants Daud and Mohamed Farah discussed the fate of other Somali ISIL fighters: "[t]oday I was reading about like four [martyrs]. Some brother wrote about them. Or six of them. Two of them are Somali. Abu Dahr, he talked about Abu Dahr. And then another brother, Abu Amal. He was in Jabha [JAN] way before and then he joined [ISIL]."[26] When Daud asked if these Somali ISIL fighters achieved martyrdom, Farah affirmed, "in Kobane."[27]   Notably, Charles Lister, the government's expert, testified at trial that ISIL used a disproportionately large number of foreign fighters to attempt to hold Kobane, and that ISIL suffered a high number of casualties in that protracted siege.  (Lister Tr. 5/12/16 p. 102).

In addition to his support for the burning of Flight Lieutenant Kasasbeh, and his glee at the memory of the massacre in Tikrit, defendant Mohamed Farah was often recorded admiring and endorsing ISIL's savagery.  Unfortunately, the evidence in the case is replete with other examples.  In one instance, as they planned their crossing of the Mexican border, defendants Daud and Mohamed Farah talked with Bashir about the "cartel members" they would encounter in Mexico.  Bashir cautioned that these cartel members were dangerous. To this, defendant Mohamed Farah Farah noted wistfully, "{those are not normal people, bro.  If only they all turned Muslim.  If only they all turned Muslim.}"[28]

---

[26] Trial exhibits 256 (audio) and 257 (transcript) at page 26.
[27] Id.
[28] Trial exhibits 241 (audio) and 242 (transcript), at page 66.

## I. Defendant Farah Threatened Violence Against the United States

On March 23, 2015, defendants Mohamed Farah and Daud discussed the possibility of ISIL sending them back to the U.S. to commit acts of terrorism at home. Defendant Mohamed Farah, after telling Daud and Bashir that he is "done with America", stated he would willingly return on behalf of ISIL: "[i]f he tells me to come back, {go have fun.}"[29] Daud then agreed, "[the U.S.] is the snake—uh—uh--the head of the snake. He's going to try and send us back. 'Do you guys know how to get anywhere in there? I got three brothers ready'." Both defendants Mohamed Farah and Daud then ominously concurred that returning to commit acts of terror could be "huge."[30]

In a conversation on April 3, 2015, defendants Mohamed Farah and Daud discussed whether defendant Musse was prepared to commit acts of violence in the U.S. After giving his opinion that Musse had no such current plans, defendant Farah then offered that "if, uh, push came to shove and, uh, there's no way out" and if "our backs [are] to the wall, I'm going to kill the one {that threatens me.}" Defendant Mohamed Farah then named the JTTF agent assigned to his case as the law enforcement officer he would target.[31]

Defendant Mohamed Farah and Bashir met with defendant Abdurahman on April 7th. Abdurahman confirmed that he would attempt to travel separate from the group. In the face of Abdurahman's desire to split off, Farah explained the need for them to go, and to go soon:

---

[29] Trial exhibits 214 (audio) and 215 (transcript), pages 64-65.
[30] Id., page 64.
[31] Trial exhibits 232 (audio) and 233 (transcript), page 436.

The {immorality} that's going on in this c… state. Wallah, how many brothers {right now} keep slipping more and more and more. They keep falling off and off and off bro. This is {even now} [UI] bro. {They took it personal.  It's between going to} prison or {jihad for the sake of Allah.}.  Ain't nothing in the middle, wallah.  {Instead of just sitting around} wallah, it's {humiliation} bro. {There is no life here for us.} There ain't no life here for us.  Every day we struggling with our {selves}. You know how hard it is. I don't have to explain it to y'all, y'all desires. How everybody's fighting to tame their soul. I… the only way you can do that it is if you be in a prison or {you gotta do hijra. There's nothing in between, wallahi.  Forget getting married here.} So let this guy send the money. {Your prepare your thing.} We prepare {then we're going to leave on a dark night,} {if God permits.} Yeah? Sound like a plan? [32]

During an extended conversation on April 9, 2015 about foreign fighters, ISIL, law enforcement attempts to intervene, logistics, and other matters, defendant Aburahman brought up the topic of an ISIL fighter who defected to the al-Qaeda affiliate in Syria, Jabahat al-Nusra (JAN).[33]   Though JAN was, at the time, successfully battling the Assad regime, Abdurahman spared no scorn:  "That guy's fitna [corrupt] bro.  He needs to be beheaded."   To this proclamation, defendant Mohamed Farah stated only that he thought

---

[32] Trial exhibits 239 (audio) and 240 (transcript), at page 51.

[33] Jabhat al-Nusra, whose name means "the support group" in Arabic, remains to this day the al-Qaeda affiliate in Syria.  Jabhat al-Nusra and ISIL are opposed to each other.  (Lister Tr. 5/12/16 pp. 56-57).

this JAN member was "locked up", to which defendant Abdurahman rejoined "I think he's dead." [34]

Abdurahman's statement and Mohamed Farah's assent to it is one of many that flies in the face of their claimed motivations for traveling overseas to wage jihad; to wit, to provide humanitarian relief to victims of the Assad regime.  The government's expert witness, Charles Lister, testified that during this critical time period, JAN was an armed group battling the Assad regime while ISIL was sitting on its hands.  See Common Appendix A, at page seven.

The Report of Presentence Investigation, at paragraph 150 on page 40, reprints the text of a letter defendant Mohamed Farah wrote to the probation office.  In it, he claims his motivation to travel to Syria  arose from a desire "to help those innocent Syrians in any way I could," and that he was inspired by the example of seeing Syrians "rebuild the buildings destroyed by Bashar giving out charities and fixing the plumbing and electricities . . . "

These statements are just more lies from this defendant.  Not even once in the dozens of hours of statements that were recorded and introduced at trial does any defendant, including defendant Mohamed Farah, speak about helping the Syrian people, or alleviating their suffering.  Rather, the defendants gloat at the suffering of others, and defendant Mohamed Farah in particular gloats, and even laughs out loud, at scenes that include the mass murder of unarmed prisoners, and the burning alive of Flight Lieutenant al-Kasasbeh.

---

[34] Trial exhibits 241 (audio) and 242 (transcript), at page 96.

### III.    ARGUMENT – THE COURT SHOULD SENTENCE THE DEFENDANT TO IMPRISONMENT FOR FIFTEEN YEARS

In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court described the sequence of a properly-conducted sentencing hearing:  the district court calculates the advisory Guidelines range, and then, after hearing from both parties, considers the 18 U.S.C. § 3553(a) factors and imposes sentence.  552 U.S. at 49-50; *United States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) factors").

Defendant Mohamed Farah should be sentenced to a term of imprisonment of 30 years.  This is a variance downwards from the advisory Sentencing Guidelines sentence of imprisonment for life.  This sentence satisfies 18 U.S.C. § 3553(a) standard of being sufficient, but not longer than necessary, to effectuate the objectives of federal sentencing law and policy.  The modest downward variance, from life to thirty years, is necessary to appropriately differentiate among differently culpable defendants in this particular case.

### A.  The Report of Presentence Investigation

The United States has no objections to the factual statements contained in the Report of Presentence Investigation prepared by the United States Probation and Pretrial Services Office.

### B.  The Sentencing Guidelines

The U.S. Probation and Pretrial Services Office's Report of Presentence Investigation correctly calculated defendant Mohamed Farah's adjusted offense level as 43, and correctly placed him in criminal history category VI.  The resulting guidelines sentence is imprisonment for life, and is found in Zone D of the guidelines sentencing chart.

The adjusted offense level and criminal history score are both quite high for this defendant in part because of the application of the terrorism enhancement at U.S.S.G. § 3A1.4.  This victim-related, Chapter Three adjustment recognizes that "an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time."  *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir.) *cert. denied sub nom. Haouari v. United States*, 538 U.S. 1068 (2003).  "We have recognized that 'Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under [U.S.S.G.] § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation."  *United States v. Stewart*, 590 F.3d 93, 143 (2d Cir. 2009) (*quoting Meskini, supra,* 319 F.3d at 92).

### C.  18 U.S.C. § 3553(a)

The factors that a district court should take into account in fashioning an appropriate sentence are listed at 18 U.S.C. § 3553(a).

### (1) The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant.

The nature and circumstances of the offense are set forth in detail in Common Appendix A.  Defendant Mohamed Farah stands convicted of multiple crimes related to international terrorism.  The terrorist organization he sought to assist is one of the most dangerous and violent in existence.  ISIL has, within the past two years, carried out mass casualty terrorist attacks in Beirut, Paris, Brussels, Nice, and San Bernardino, while a man claiming to be acting on ISIL's behalf has carried out a mass shooting, killing 50 persons, at a nightclub in Orlando.

Defendant Mohamed Farah is 22 years old and is the eldest of seven children.  One of his younger brothers, defendant Adnan Farah, pleaded guilty in this case to conspiring to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B. Defendant Mohamed Farah himself, he has tried twice – in the Fall of 2014 and in the Spring of 2015 - to reach Syria and join ISIL.  He would have made an attempt in the Spring of 2014 also, but for his parents' confiscation of his passport.  The defendant is wholly approving of ISIL and its depraved behavior.  He enjoyed hugely "On the Prophetic Methodology," and its depictions of mass murder, and he strained for a theological justification for ISIL's burning of Flight Lieutenant Kasasbeh.  Being sent home from New York on November 8, 2014, after being interviewed by an FBI Agent, and being greeted

in Minnesota by more FBI Agents, the Minnesota agents bearing a grand jury subpoena and a target letter, could have been expected to have caused most people to change their criminal plans.  Not so defendant Mohamed Farah.  Together with his co-conspirators, he dusted off an old plan that had been discussed in the Spring of 2014, and pivoted seamlessly to plotting to travel to Syria via Mexico on a fake passport.  On April 19, 2015, of course, he was arrested in San Diego while doing exactly what he had planned to do.

The defendant has not been convicted of an impulsive act that was carried out in the heat of the moment. Even though his convictions in this case represent his first criminal convictions, the defendant took multiple, deliberate steps, over nearly a year, to try and travel to Syria where he would join ISIL.

### (2) The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

Defendant Mohamed Farah stands before this Court convicted of some of the most serious crimes in the federal criminal code.  Three people, at least, have died in Syria as a result of this conspiracy – Douglas MacAuthur McCain, Abdi Nur, and Yusuf Jama.  The offense's seriousness is adequately reflected in a thirty-year sentence, as is respect for the law and just punishment.  As the Supreme Court has recognized, "combating terrorism is an urgent objective of the highest order." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010).

Respect for the law is a particularly important factor in this case.  No trial in the aggregate memory of the U.S. Attorney's Office has been conducted in more of an atmosphere of intimidation, harassment, and incipient violence than the trial of this case.

34

The families of cooperating defendants were harassed in the courtroom, in full view of the testifying witness; there was a fistfight in the corridor outside the courtroom; multiple individuals had to be ejected from the courtroom for not following the Court's rules of behavior.  A sentence in this case must be of sufficient length to promote respect for the law, and to demonstrate clearly that this is a nation of laws.

> **(3) The Need for the Sentence to Afford Adequate Deterrence to Criminal Conduct, and the Need for the Sentence Imposed to Protect the Public from Future Crimes of This Defendant.**

A significant sentence in this case is needed for both individual and general deterrence.  It is also needed to protect the public from defendant Mohamed Farah. Individual deterrence discourages a defendant from committing such a crime again. General deterrence is necessary to deter other people from committing similar crimes. "Congress specifically made general deterrence an appropriate consideration . . ., and we have described it as 'one of the key purposes of sentencing.'" *Ferguson v. United States*, 623 F.3d 627, 632 (8th Cir. 2010) (*quoting United States v. Medearis*, 451 F.3d 918, 920 (8th Cir. 2006)).

Not too long ago, Minnesota suffered a wave of young men traveling to join al Shabaab, and presumably many of those young men are now dead.  Despite these deaths and the surrounding investigation and prosecutions, here yet another group of Minnesota men attempted to leave the United States to become terrorists.  As the Court witnessed in the Courtroom and surrounding press coverage, despite the gravity of the charges, the defendants had significant support.  General deterrence is necessary to impress upon some

individuals within the community that no matter your age, religion, or politics, trying to become a terrorist has serious, dire consequences.

The case for individual deterrence, and the case for a sentence that protects the public from further crimes of the defendant, was extensively laid out above in this position pleading. The details of defendant Mohamed Farah's extensive, persistent, and long-lasting role in this crime speak for themselves as an explanation of defendant Mohamed Farah's threat to public safety and national security. The thirty-year sentence sought by the government is justified to protect the public from defendant's deeply held desire to become an ISIL fighter.

Terrorist activity by ISIL has only increased since defendant first began plotting to leave for Syria. ISIL attacks in Paris, Nice, Beirut, Brussels, and San Bernardino have all occurred since defendant Mohamed Farah began plotting to leave for Syria. Those attacks have claimed hundreds of lives and have made manifest the need to protect the public from the deeds of people like this defendant.

A substantial sentence is needed to deter individuals from supporting designated foreign terrorist organizations such as ISIL, and from providing ISIL with material support. As the Supreme Court has noted:

"Material support" is a valuable resource by definition. Such support frees up other resources within the organization that may be put to violent ends. It also importantly helps lend legitimacy to foreign terrorist groups – legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds – all of which facilitate more terrorist attacks.

*Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010)

Terrorism, being motivated by fanaticism, is difficult to deter.  The effort must nevertheless be made.  However, if deterrence should be unavailing, then a thirty-year sentence is amply justified as a means of incapacitating the defendant.

The most important objective of any government is the physical safety of the people. Physical safety is the necessary precondition to the exercise of all other rights, such as freedom of expression, of religion, and of the press, to name only a few.  Defendant Mohamed Farah's repeated attempts to reach Syria, and his chilling statements, reproduced above, of willingness to re-enter the United States to perpetrate terrorist attacks here, or his statements, also reproduced above, of intent to kill FBI Agents, make him dangerous.  The danger is increased by defendant Mohamed Farah's morbid enthusiasm for death and cruelty, as evidenced by his fascination with ISIL propaganda videos showing mass murder, or the burning to death of a human being.  A long sentence will, if nothing else, incapacitate the defendant and make it impossible for him to hurt anyone.

### (4) The Need for the Sentence to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner.

At this time, it is difficult to identify any particular programming that will benefit defendant Mohamed Farah.  No such programming is identified by the PSR.  As noted by the Court during the hearing held to present the assessments of the court's expert, Daniel Koehler, there is at this time no counter-radicalization programming offered by the Bureau of Prisons.  In any event, there is no indication that defendant Mohamed Farah would participate in, or benefit from, such counter-radicalization programming.  This particular 3553(a) factor appears to be inapplicable to this defendant, though should that change

37

during his term of imprisonment, the government will of course not stand in the way of defendant Mohamed Farah receiving any programming that will reduce the risk he currently represents to the safety of the public.

## (5) The Kinds of Sentences Available

The United States has submitted a Report concerning sentences imposed on defendants who have traveled overseas, or attempted to travel overseas, in the past two years in support of a designated foreign terrorist organization.

A review of the sentences imposed is telling.  Of 20 defendants, in 14 cases, convicted of an 18 U.S.C. § 2339B violation, 14 of those defendants, or nearly three-quarters, were sentenced to the statutory maximum sentence of fifteen years' imprisonment.  Only four of these convictions followed trial; the rest were all the result of guilty pleas.  In short, courts are imposing the maximum sentences allowed by law in 2339B cases, even when defendants have admitted to their wrongdoing and initiated the rehabilitative process by pleading guilty.

Defendant Mohamed Farah did not plead guilty, and he has been convicted not only of multiple 2339B counts, but also of conspiracy to murder.  The sentence of thirty years' imprisonment, requested by the government, is consistent with the national sentencing pattern in similar cases.

IV.    CONCLUSION

For all these reasons, the United States respectfully asks this Court to sentence defendant Mohamed Farah to a term of imprisonment of thirty years, followed by supervised release for the rest of his life.


Dated: November 3, 2016                    Respectfully Submitted,

                                           ANDREW M. LUGER
                                           United States Attorney

                                           *s/ John Docherty*

                                           BY:   JOHN DOCHERTY
                                           Assistant United States Attorney
                                           Attorney Reg. No. 017516X

                                           ANDREW R. WINTER
                                           Assistant United States Attorney
                                           Attorney Reg. No. 232531

                                           JULIE E. ALLYN
                                           Assistant United States Attorney
                                           Attorney Reg. No. 256511

## COMMON APPENDIX A – THE SYRIAN INSURRECTION AND ISIL

This Appendix A to the Government's Sentencing Positions describes (a) historical and Syrian current affairs context that is common to all nine Sentencing Positions being submitted to the Court by the government, and (b) a capsule summary of the facts proven at trial. This Appendix is reproduced in each of the government's sentencing positions, and is identical in each. No attempt has been made to write a factual summary that is more comprehensive than the very thorough Reports of Pre-Sentence Investigation written in this case by United States Probation officers. However, this Common Appendix A does go into more detail than the PSRs about the history of the Syrian insurrection, and the role in that insurrection of the designated foreign terrorist organization the Islamic State in Iraq and the Levant, or "ISIL." If there is interplay between events in Syria and events in Minnesota, Common Appendix A tries to correlate events in Syria with significant events that were happening in this case, here in Minnesota, at about the same time as the events in Syria.

As to the first part of Common Appendix A, history and current events, Common Appendix A relies upon the trial testimony of the government's expert witness, Charles R. Lister, Senior Fellow at the Middle East Institute, Washington, D.C. Common Appendix A does not summarize all of Mr. Lister's testimony. Instead, it highlights those parts of his testimony which are important to understanding the issues in these sentencings. These matters are a short history of the Syrian insurrection, the origins of ISIL, as well as ISIL's extraordinary brutality and the part such brutality plays in ISIL's recruitment of foreign fighters. Finally, this Common Appendix A concludes with a brief description of ISIL's

1

understanding of the importance, to what in ISIL's view would be an observant Muslim, of participating in the fighting now taking place in Syria.

The second part of Common Appendix A seeks to provide an overview of the facts of the case, and to provide a description of the facts of the case that can be referred to in all of the government's sentencing position papers.

The facts concerning historical background and Syrian current events in Common Appendix A are taken from a transcript of the trial testimony of the government's expert witness, Charles R. Lister, Senior Fellow at the Middle East Institute, Washington, D.C. As to other trial facts, which have not yet been transcribed, Common Appendix A relies on the contemporaneous notes of Assistant U.S. Attorneys and FBI Special Agents.

**Developments in Syria from the Arab Spring (2011) to 2013 Abu Musab al-Zarqawi's founding of ISIL (2013)**

Syrian President Bashar al-Assad took power in 2000, continuing the reign of his father, Hafez al-Assad. Between them, the two Presidents al-Assad have ruled Syria as a dictatorship for more than forty years. Bashar al-Assad has used brutal repression against his political opponents, including extensive and intrusive police surveillance followed by arrest, torture, and execution. The efforts of ordinary citizens, during the "Arab Spring," to protest against the regime, were met by the Assad regime with violence.

The Arab Spring began at the end of 2011, and was triggered by a Tunisian man who burned himself to death in a desperate act of protest after being humiliated by the police. The Arab Spring anti-dictatorship movement spread across North Africa and the Middle East in the months that followed.

2

In Syria, the wealthy had for decades been supporters of the regime.  After Bashar al-Assad took power in 2000, this increased, and the gap between rich and poor in Syria became even more stark than it had been.   When Bashar al-Assad introduced economic liberalization measures, with support given to small businesses, it turned out that the small businesses that received assistance were the small businesses of regime supporters.

On March 6, 2011, the Syrian internal security services arrested 15 schoolboys in the southern Syrian city of Deraa, alleging that they had been chanting revolutionary songs as they walked home from school.  All the boys were tortured, and several of them were killed.  Peaceful protests of the boys' arrest were met by the regime with live ammunition, resulting in several deaths.  Over the next few days, protests spread to numerous Syrian cities.  The arrest and torture of these schoolboys in Deraa, and the regime's heavy-handed response to it, marks the beginning of the Syrian insurrection against President Bashar al-Assad.  The insurrection soon transitioned from peaceful protest to armed revolt against the Assad regime.

The reaction of the Bashar al-Assad regime to the events in Deraa was consistent with the reaction to opposition of President Bashar al-Assad's father, Hafez al-Assad, during the time he had been Syria's president.  For example, in the 1980s a splinter faction of the Muslim Brotherhood tried to rise up in arms against President Hafez al-Assad in the Syrian city of Hamaa.  President Hafez al-Assad responded with months of artillery shelling of Hamaa, which killed between 10,000 and 40,000 of the city's inhabitants.

As protests and fighting spread across Syria during 2011, the United States expressed sympathy for Syrians engaged in peaceful, anti-Assad protests.   U.S.

3

Ambassador to Syria Robert Ford attended several anti-regime protests, a clear signal of U.S. government support.  The regime responded by physically threatening the U.S. Embassy, and at one point withdrew security personnel from around the embassy and allowed pro-regime thugs to ransack the building.  The United States then withdrew its diplomats from Syria.  The United States has had no diplomatic or consular representation in Syria since 2011.

Arab Spring opposition to the Assad regime spanned all sectors of Syrian society. One component of the anti-regime opposition was a specifically religious, Islamic opposition.  For a time following the U.S. invasion of Iraq, President Bashar al-Assad was able to neutralize the Islamic opposition within Syria by busing Islamic fighters over the border into Iraq, where they could fight Americans and their Iraqi allies.  Eventually some of these Islamic fighters returned from Iraq (or Lebanon, another place to which the Assad regime had sent them) to Syria.

## I.   THE SYRIAN HISTORICAL AND CURRENT EVENTS CONTEXT OF THIS CASE.

### A.  Abu Musab al-Zarqawi, the Origins of ISIL, and the Roots of ISIL's Extreme Violence

In 1999, Abu Musab al-Zarqawi was released from the Jordanian prison where he had been serving a sentence for support of a terrorist organization.  Shortly after his release from prison, Zarqawi traveled to Afghanistan, where he made contact with the senior leadership of al-Qaeda.  With $200,000 of al-Qaeda's money, and a plot of land donated by the Taliban, Zarqawi established a terrorist training camp in Afghanistan.  In 2000, Zarqawi and the organization he had founded attempted to perpetrate the "millennium

plot," which included attacks on the Radisson Hotel in Amman, and several other western hotels in Amman.  The plot was foiled.

When the U.S. invaded Afghanistan following the attacks of September 11, 2001, Zarqawi fought for a short while, but then fled Afghanistan, going first to Iran, and then on to northern Iraq.  Following the U.S. invasion of Iraq, Zarqawi and his organization conducted a campaign of bombings against the United States military and other targets, including the United Nations and the Jordanian embassy. At this time, Zarqawi did not have any official relations with al-Qaeda, but in late 2003 and on into 2004 Zarqawi reached out to al-Qaeda in an effort to have his organization and al-Qaeda work together. In May of 2004, Zarqawi conducted his first videotaped beheading, of U.S. hostage Nicholas Berg.  Several months after this atrocity, in October of 2004, Zarqawi "made *baya*" (swore allegiance) to al-Qaeda. Zarqawi's organization took the name "al-Qaeda in Iraq," and became al-Qaeda's first international affiliate.

Zarqawi was ferociously anti-Shiah, and his organization in turn became deeply anti-Shiah. Zarqawi believed the Shiah had to be fought until they were all exterminated. Zarqawi dispatched his own father to carry out a suicide bombing at a Shiah shrine in the Shiah holy city of Qatib, in southern Iraq, which killed a Shiah ayatollah.  Shiah were referred to by the insulting term "rafidi" which means "one who refuses," specifically, one who refuses to recognize the legitimacy of the line of succession from the prophet that is recognized by Sunni Islam.  The Assad regime, although its top members are Alawites, gets support from Iran, the dominant Shiah power in the middle east, and opposition or

support for the Assad regime tends to fall along Shiah-Sunni lines, with Shiah in support of the regime, and Sunni in opposition to it.

Following the pledge of *baya*, tension between Zarqawi and al-Qaeda persisted, primarily over the issue of brutality and the killing of Muslims.  Zarqawi's bombing campaign in Iraq may have targeted non-Muslims, but the bombs were very powerful, were often detonated in public places, and as a result they killed many Muslims.  In Zarqawi's view, such deaths were acceptable, because Zarqawi believed Iraqi society needed to be thoroughly cleansed of all western and secular influences.  To al-Qaeda, however, Zarqawi's bombings were a catastrophe in terms of al-Qaeda's ability to maintain the support of ordinary Muslims.  There was an exchange of letters between al-Qaeda and Zarqawi over this issue, at the end of which al-Qaeda ordered Zarqaqi to be more discriminating in his bombing.  In response, Zarqawi's behavior, if anything, actually got worse.

Zarqawi was killed by American military action in June of 2006.  In October of 2006 one of his successors as the leader of al-Qaeda in Iraq renamed the organization "the Islamic State in Iraq."  After some years in which it was not clear whether the Islamic State in Iraq was or was not still part of al Qaeda, the two organizations formally split in 2013.

Before the split, in May through August of 2011, discussion began about opening a Syrian wing of the Islamic State in Iraq.  In August of 2011, seven senior members of the organization crossed into Syria, and activated a dormant network of safehouses in northeastern Syria.  In Syria, this group went by the name Jabhat al-Nusra, the "support group."  When the split between the Islamic State and al-Qaeda occurred in 2013, Jabhat

6

al-Nusra remained a part of al-Qaeda, while the Islamic State went on its own, independent path.

In June of 2014, abu Bakr al-Baghdadi, then leader of what had become the Islamic State in Iraq and the Levant, or "ISIL," mounted the steps of the pulpit in a mosque in Mosul, Iraq and proclaimed the re-establishment of a caliphate, a supreme Islamic religious and political entity that had a legitimate claim to the loyalty of every Muslim in the world.

### B. ISIL's Need for, and Recruitment of, Foreign Fighters

Several factors drove ISIL to need foreign fighters to fill its ranks.

First, as testified to by Mr. Lister, ISIL did not govern populations so much as it controlled them.  Its theological rulings were bizzare (the sale of ice cream was forbidden because ice cream did not exist in the prophet's time, and the sale of cucumbers was forbidden because cucumbers were sexually suggestive, for example), and its punishments for even minor infractions were extraordinarily sadistic and carried out in public. ISIL could recruit from the local population only through fear, and as a result local recruits understandably tended not to be good fighters.  Second, from August of 2013 until July of 2014, ISIL did not fight the Assad regime; instead, it waged war on other anti-regime opposition groups.  Of the 7,000 people killed in combat by ISIL during the first six months of 2014, not one was an Assad regime soldier.  At this same time, the Assad regime stopped fighting ISIL, probably because the regime recognized that ISIL was doing the regime's work for it.  These facts made it impossible for ISIL to augment its numbers by allying with other opposition groups.

In response, ISIL recruited very heavily from abroad, relying on three different recruiting messages.

First, abu Bakr al-Baghdadi, in his role as caliph and leader of the faithful, claimed that it was the duty of all Muslims throughout the world to come and join the Islamic State, and to fight for that state.  Second, ISIL used its extreme brutality as a recruiting tool.  To do so, ISIL characterized its actions to a local audience as expressions of power and dominance over a Shiah-dominated Iraqi government, and to an international audience as an organization that was bringing power back to Sunni Islam by showing no mercy to the enemies of Sunni Islam.  To publicize its brutal acts, ISIL has proven very savvy at using electronic media.  As the evidence at trial showed, many ISIL propaganda videos were enthusiastically viewed by defendants in this case.

Third and finally, ISIL has adopted an apocalyptic ideology about the end times which places great value on dying as a martyr in Syria at this particular time in human history.  At the end of human history, ISIL preaches, Jesus will descend from heaven to the white minaret of the main mosque in Damascus, and from there will lead an army to the Syrian village of Dabiq, northeast of Aleppo, where the final battle between the forces of good and the forces of evil will be fought.  As Mr. Lister explained:

> . . . one of the reasons why ISIL has been so effective at recruiting so heavily from non-Syrian and Iraqi populations is because it has claimed to be operating in Syria within this broader mindset.  The idea that you can go and fight in Syria in order to contribute towards bringing about the end of the world is something that its ideology – its propaganda, sorry, has made very clear for a long time.  In fact, Dabiq was something that Abu Musab al-Zarqawi all the way back in the 2000s spoke about very clearly, our armies will one day reach Dabiq, and, you know, bring about the end of days.  So

8

it's a core tenet, it's a core principle of ISIL's belief. And fundamentally, it's a core reason for why they wanted to operate in Syria all along.

When asked to link this ideology to the recruitment of a potential foreign fighter, Mr. Lister continued:

> I mean, generally speaking, there is a belief within these organizations that if you fight in the name of Allah, in the name of God, and you die as a martyr, you will automatically go to paradise. I believe their understanding is that if you die in these battles, which ISIL claims to be bringing out the end of days, then you will obtain a, you know, a high place in paradise alongside God. So the importance of fighting in Syria specifically, as I say, is of that utmost importance.

Finally, Mr. Lister pointed out in his testimony that some of the outrages perpetrated by ISIL, such as the beheadings of western hostages, were "trying to bait the west into intervening more," in order to precipitate the final battle between Muslims and non-believers.

As a result of all three factors, a vast majority of ISIL's forces at for example, the battle of Kobani, under the command of ISIL commander Omar al-Shishani, were foreigners, who sustained huge casualties. Of note, the battle of Kobani pitted ISIL against Kurdish militia. At no time, did the battle of Kobani involve combat between ISIL and Assad regime forces.

## II.     THE FACTS OF THIS CASE

The evidence at trial demonstrated the existence of a conspiracy among the defendants to travel to Syria via Turkey, cross the border into Syria, and there join, and fight for, ISIL. There were three major efforts by the defendants to reach Syria, in the Spring of 2014, the Fall of 2014, and the Spring of 2015.

9

The Spring of 2014 effort had two components.  In one, defendant Guled Omar, together with Abdirahman Bashir (then a member of the conspiracy, later a cooperating human source for the FBI) and Yusuf Jama, attempted to drive to Mexico and travel onwards from Mexico to Turkey and then Syria.  In preparation for this attempt, defendant Omar withdrew $5,000 in cash using his federal student financial aid debit card.  Those funds were never repaid, and as a result of this financial behavior, defendant Omar was later found guilty of federal financial aid fraud, in violation of 20 U.S.C. § 1097.  The attempt at driving was thwarted by defendant Omar's family.  Later, however, on June 9, 2014, Yusuf Jama left the Twin Cities by Greyhound bus, traveled to New York City's John F. Kennedy International Airport (hereinafter "JFK"), and flew from there to Turkey and onwards to Syria.  Jama is believed to have later been killed in combat while fighting for ISIL and against Kurdish militia at the battle of Kobani.

The second component of the conspirators' Spring of 2014 effort involved cooperating defendant Abdullahi Yusuf's attempt to travel on May 28, 2014, and Abdi Nur's successful travel on May 29, 2014.  Yusuf was booked on an itinerary that would have taken him on the Russian airline Aeroflot from Minneapolis-Saint Paul to JFK, then on to Moscow, Russia, before taking an Aeroflot flight from Moscow to Istanbul. However, when Yusuf applied for a passport on April 28, 2014, he aroused the suspicions of an alert passport specialist in the Minneapolis passport office.  The passport specialist relayed his suspicions to his supervisor, who told the FBI.  As a result, FBI Agents were waiting for Yusuf when he arrived at the Minneapolis – Saint Paul airport on May 28 to

catch his flight to JFK.  Yusuf was denied boarding, and after continuing to falsely claim to the FBI that he was going solo to Istanbul for vacation, sent home.

The Fall of 2014 effort also had two components. In the first, defendant Guled Ali Omar again tried to reach Mexico, this time by taking a flight from Minneapolis – Saint Paul to San Diego.  The FBI was told that defendant Omar had made a travel booking, and federal agents met Omar at the airport.  Omar arrived at the airport carrying no luggage, and in possession of his passport.  He was denied boarding and sent home.  After being turned away at the airport, defendant Omar telephoned defendant Hanad Musse, using "Magic Jack," an application that disguises one's telephone number. In that call, defendant Omar pleaded with defendant Musse to drop their own plans to travel to Syria.  In that telephone call, defendant Omar told defendant Musse that "I just got caught up."

The plans from which defendant Omar was trying to dissuade defendant Musse involved Musse and three other defendants – Mohamed Farah, Hamza Ahmed, and Zachariah Abdurahman – following the example of Yusuf Jama by taking Greyhound buses to JFK, and flying from there to various destinations in southeastern Europe, such as Athens, Istanbul, and Sofia, and then traveling on to Turkey and, ultimately, Syria.

Musse refused to drop the plans and "the JFK Four" continued to New York.  There, they were met by agents of the FBI and denied boarding.  Defendant Hamza Ahmed had boarded his flight, and was escorted off the aircraft by federal agents.  When three of the four were interviewed by the FBI in New York (defendant Hanad Musse left JFK without being interviewed; however, Mohamed Farah, Hamza Ahmed, and Zachariah Abdurahman were interviewed at JFK), they lied, claiming that they did not know each other, and that

11

they were all traveling to Europe, by themselves, for vacation. In the case of defendant Mohamed Farah, this meant that he claimed to be traveling to Sofia, Bulgaria, in November, for a beach vacation lasting one day. Upon return to Minnesota, each of the defendants was given a target letter from the U.S. Attorney's office, telling them they were targets of a federal criminal investigation into allegations of conspiracy to provide material support to a designated foreign terrorist organization. The JFK Four were then again interviewed, this time by Minneapolis-based FBI agents. They maintained the fictions they had given to the New York FBI agents. (Defendant Hanad Musse had not been interviewed in New York.)

Later in November of 2014, defendant Abdullahi Yusuf, who had been at liberty since trying to leave in late May, was arrested on a criminal complaint charging him., together with Abdi Nur, with conspiring to provide material support and resources to ISIL, and with actually providing material support and resources to ISIL (the material support and resources provided was the person of Abdi Nur). In February of 2015, defendant Hamza Ahmed was arrested, and detained pending trial. Defendant Ahmed was therefore unable to conspire with his codefendants when, in the Spring of 2015, they began conspiring yet again to go to Syria to join ISIL.

The failure of the Fall 2014 attempt did not lead the defendants to drop their ambitions to travel to Syria. In the Spring of 2015, they again began planning to leave the United States, go to Turkey, then go onwards into Syria to join, and fight for, ISIL. Shortly after this third and final round of plotting began, Abdirahman Bashir decided to cooperate

with the FBI's investigation.  He wore a recording device and recorded many hours of incriminating conversations between March and April of 2015.

The defendants had hoped to make a connection in Tijuana, Mexico, with a source for false passports.  When this plan could not be completed, because Abdi Nur, in Syria, was unable to connect with the Mexican ISIL fighters who were to provide the contact information in Tijuana, Bashir, with the approval of the FBI, stated that he had a source for false passports in San Diego.

On April 17, 2015, Bashir, together with defendants Mohamed Farah and Abdirahman Daud, left home in defendant Daud's Honda Civic, bound for San Diego. Upon arrival in San Diego on Sunday, April 19, defendants Daud and Farah were arrested at a warehouse in San Diego when they took possession of fake passports from "Miguel," a San Diego police officer who had been acting the part of a procurer of fake passports. The arrests in San Diego were followed within minutes by the arrests in Minnesota of the remaining defendants:  Guled Ali Omar, Adnan Abdihamid Farah, Zachariah Yusuf Abdirahman, and Hanad Mustofe Musse.