## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

UNITED STATES OF AMERICA,

                Plaintiff,

v.                                     **SENTENCING MEMORANDUM**
                                    **AND OPINION**
                                Criminal File No. 15-49 (02) (MJD/FLN)

MOHAMED ABDIHAMID FARAH,

                Defendant.

_____

John Docherty, Andrew Winter and Julie Allyn, Assistant United States
Attorneys, Counsel for Plaintiff.

Murad Mohammed, Murad Defense, Counsel for Defendant.

_____

## I.      SUMMARY OF SENTENCING DECISION

Following a jury trial, the Defendant was found guilty on all counts for

which he was charged in the Second Superseding Indictment: Count 1,

Conspiracy to Commit Murder Outside the United States in violation of 18 U.S.C.

§§ 956(a) and (2); Count 2, Conspiracy to Provide Material Support to a

Designated Terrorist Organization in violation of 18 U.S.C. § 2339B(a)(1); Counts

5 and 6, Attempting to Provide Material Support to a Designated Foreign

1

Terrorist Organization in violation of 18 U.S.C. §§ 2339B(a)(1) and 2; Count 9[1],

Perjury in violation of 18 U.S.C. § 1621; and Count 12, False Statement in

violation of 18 U.S.C. § 1001.

When imposing a sentence in any criminal case, this Court must take into

consideration the applicable guideline range calculated pursuant to the United

States Sentencing Guidelines ("USSG") and the statutory sentencing factors set

forth in Title 18 U.S.C. § 3553(a).

The Court has carefully considered all of these factors and finds that a

variance from the applicable sentencing guideline range of life in prison is

warranted.  Accordingly, the Court finds that a sentence of three hundred-sixty

(360) months is sufficient, but not greater than necessary, to comply with the

sentencing purposes set forth in both § 3553(a) and the relevant guidelines.

## II.    INTRODUCTION

Crimes that involve acts of terrorism "represent[] a particularly grave

threat because of the dangerousness of the crime and the difficulty of deterring

---

[1]To avoid jury confusion, the jury was presented a redacted Indictment which omitted the counts against those defendants that entered into plea agreements.  As a result, the Special Verdict Form identifies the perjury count against the Defendant as Count 7, and the false statement count as Count 9.

and rehabilitating the criminal [] thus [] terrorists and their supporters should be incapacitated for a longer period of time." United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003).

In 2014, the Defendant agreed to conspire with others to join one of the most dangerous and violent terrorist organizations the world has ever known, the Islamic State of Iraq and the Levant ("ISIL"). By joining this conspiracy, the Defendant agreed to be part of the largest group of committed ISIL travelers from Minnesota; an ISIL terrorist cell that, left unchecked, could have caused immense destruction and the loss of many lives, both here and abroad.

As part of this cell, the Defendant watched some of the horrific propaganda videos produced by ISIL. These videos depict ISIL members killing innocent victims in the most violent and despicable manner, such as mass beheadings, shootings and in one case, a Jordanian pilot that was burned alive.

Each member of the conspiracy took affirmative steps to travel overseas to join and fight with ISIL. Some of the conspirators successfully traveled to Syria and joined ISIL; most of whom have since been killed.

The evidence at trial clearly demonstrated that each member of the conspiracy knew that what they were doing was wrong. To avoid the scrutiny of

their families, friends and most importantly, law enforcement, they followed the ISIL playbook, which counseled "fake it till you make it." This strategy required the conspirators to remain under the radar by going to school, working to provide financial assistance to their families, attending the Mosque, and remaining otherwise law-abiding. This strategy also provided that if confronted by law enforcement, they should loudly complain that they were being profiled because they were Muslim. In order to carry out this strategy, however, the conspirators had to lie to their parents and family, to the FBI agents investigating this case, to the grand jury and to the prosecutors.

The members of the conspiracy were deeply committed to the violent jihadist ideology of ISIL. Because of this commitment, they were **not** deterred when subpoenaed to testify before the grand jury or when they received a target letter[2] from the United States Attorney's Office. Members were **not** deterred when physically prevented from boarding flights here in Minneapolis or in New York City in their effort to join ISIL in Syria. They were **not** deterred when confronted by their parents, grandparents or siblings.

---

[2]A target letter is sent from the United States Attorney's Office informing the recipient that he/she is a target of a federal criminal investigation.

4

Despite all of the obstacles put in their way, the members of this conspiracy continued the march toward their admitted objective; to be a committed jihadi warrior, and to travel to Syria to fight, kill and become a martyr.

## III.   FINDINGS OF FACT

The Court adopts the factual statements contained in the presentence report ("PSR") as its findings of fact.  In addition, the Court adopts those facts set forth in Common Appendix A to the Government's Position on Sentencing [Doc. No. 720] and attached hereto as Common Appendix A.

In addition, the Court takes into consideration all of the evidence introduced at trial[3] when imposing sentence.

## IV.   APPLICATION OF THE GUIDELINES

The Defendant argues his base offense level should be reduced for acceptance of responsibility.  He concedes that he did not accept responsibility initially, but he has done so in his letter to the PSR writer.  (PSR ¶ 150.)  In this letter, the Defendant stated that it took time for him to remove himself from the corrupting influences of the propaganda produced by ISIL. He wrote that during

---

[3]The trial took place over nineteen days, during which 26 witnesses testified for the government, 1 witness for the defense and over 300 exhibits were admitted into evidence.

the time of the conspiracy and afterward, he was unable to think clearly and objectively to recognize the harm that his actions caused.  The Defendant further stated he believed he was pursuing just causes, such as the protection of innocent Syrians.  But through the legal process and time away from ISIL propaganda, he has come to his senses, and is remorseful and accepting of his role in the conspiracy.

The adjustment for acceptance of responsibility is not intended for a defendant who put the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted and only then admits guilt and expresses remorse.  Application Note 2 to § 3E1.1.  In addition, a defendant who is assigned a two level enhancement for obstruction of justice usually cannot receive a reduction for acceptance.  In this case, a two level enhancement for obstruction was applied to the Defendant's offense level because he lied to the grand jury, to the FBI Agents that interviewed him at JFK Airport and to FBI Agents and an Assistant United States Attorney who interviewed him in January 2015.  Accordingly, the Court denies the Defendant's request to adjust the offense level based on acceptance of responsibility.

The Court finds the applicable guideline range is based on a total offense

level of 43 and a criminal history category VI, which results in a guideline range

of life in prison.

### A.      Downward Departure Based on Criminal History Category

The Defendant argues a downward departure as to criminal history is

warranted because the criminal history category is meant to reflect what a

defendant has done in the past, and to reflect the fact that someone with a longer

and more severe criminal history deserves a higher sentence.  The Defendant

argues, however, that he is a young man who had not been involved in the

criminal justice system in any way prior to his arrest.  To ignore his record would

be to reject the highly individualized and discretionary inquiry that is crucial to

sentencing.  See United States v. Pepper, 562 U.S. 467, 487-88 (2011).

The Court recognizes that it has the discretion to depart downward under

§ 4A1.3 if it finds that the terrorism enhancement over-represents the seriousness

of the Defendant's past criminal conduct or the likelihood he would reoffend.

The Court declines to exercise that discretion in this case, given the nature of the

offenses of conviction, which involved attempts to travel overseas to join and

fight with ISIL, one of the most dangerous and violent terrorist organizations the

world has ever known.  See Meskini, 319 F.3d at 92 (recognizing that "even

terrorists with no prior criminal behavior are unique among criminals in the

likelihood of recidivism, the difficulty of rehabilitation and the need for

incapacitation.")

Accordingly, the Court will deny the Defendant's motion to depart

downward based on overstatement of criminal history.

**V.      SENTENCE**

The Defendant is sentenced to a term of imprisonment for three hundred

and sixty (360) months: three hundred and sixty (360) months on Count 1; one

hundred and eighty (180) months on Counts 2, 5 and 6; sixty (60) months on

Count 9; and ninety-six (96) months on Count 12; all terms of imprisonment to be

served concurrently.  Following his term of imprisonment, the Defendant is

subject to a life term of supervised release on Counts 1, 2, 5 and 6, and three years

supervised release on Counts 9 and 12, to be served concurrently.  Based on the

Defendant's current economic condition, the Court did not impose a fine, but did

impose a special assessment in the amount of $600.

**VI.     STATEMENT OF REASONS**

Pursuant to the Supreme Court decision in United States v. Booker, 543

U.S. 220 (2005), the United States Sentencing Guidelines are no longer

mandatory.  The Court is nonetheless required to take into account the applicable

Guideline range and the pertinent Sentencing Commission policy statements.  In

addition, the Court must impose a sentence sufficient, but not greater than

necessary, to comply with the following sentencing purposes:

> (A) to reflect the seriousness of the offense, to promote respect for
> the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational
> training, medical care, or other correctional treatment in the most
> effective manner.

18 U.S.C. § 3553(a).

The Court also considers the nature and circumstances of the offense and

the history and characteristics of the defendant; the kinds of sentences available;

the need to avoid unwarranted sentencing disparities among defendants with

similar records who have been found guilty of similar conduct; and the need to

provide restitution to any victims of the offense.

**A.**     **Section 3553(a) Factors**

**1.**     **Nature and Circumstances of the Offense**

The Defendant was deeply committed to traveling to Syria to join ISIL and to assist his co-conspirators in their attempts to travel and join ISIL. For example, he posed as Abdullahi Yusuf's father so that Yusuf could leave the school grounds and then accompanied Yusuf and his brother Adnan to the passport office so they could complete applications for an expedited passport. The Defendant also signed Adnan's passport application, claiming that their parents were too sick to sign. The Defendant also helped Abdi Nur prepare for his travel to Syria. Yusuf was stopped by the FBI at the airport, but Nur successfully departed and joined ISIL in Syria.

During the summer of 2014, the Defendant and his co-conspirators maintained contact with ISIL members in Syria and Iraq. They also began to watch the horrific ISIL propaganda videos that were being distributed that depicted mass murders and the torture of prisoners. On many occasions, the Defendant and other members of the conspiracy watched these videos while they worked at a mail and package facility. They also discussed their plans to go to Syria to join ISIL.

In many conversations recorded by the confidential human source Abdirahman Bashir, the Defendant can be heard praising ISIL and the atrocities

they committed against innocent and unarmed victims.  For example, in one recording, the Defendant is heard talking enthusiastically about an ISIL video that depicts victims being led to the edge of the Tigris River by ISIL members, then shot in the head and their corpses pushed into the river.  In another recording, the Defendant is heard to say he would willingly return to the United States on behalf of ISIL to commit acts of terror and in another recording, the Defendant stated "if push comes to shove and, uh, there's no way out" and if "our backs [are] to that wall, I'm going to kill the one {that threatens me}."  He then specifically named the agent assigned to this case as the one he would target.

In September 2104, the Defendant was subpoenaed to testify before a grand jury.  During his testimony, the Defendant provided false answers to questions put to him.  For example, he failed to disclose the nature and frequency of his last contacts with Abdi Nur before he traveled to Syria in late May 2014.  He also falsely testified that he did not use Facebook or the messaging application "Kik" to communicate with anyone overseas.  He also lied about whether he spoke with Yusuf after he was stopped by law enforcement in May and lied about shopping with Nur before he departed.

11

In November 2014, the Defendant, Hanad Musse, Zacharia Abdurahman and Hamza Ahmed traveled by bus to New York City.  Once in New York, the Defendant purchased an airline ticket to Bulgaria with the intent of getting off the flight in Turkey and completing his travel to Syria.  However, at JFK, the group was prevented from traveling by law enforcement.  When interviewed by  FBI agents, the Defendant lied about his travel plans and whether he knew Musse, Abdurahman or Ahmed.  He was again questioned in Minnesota by the FBI about his attempt to travel from JFK, and the Defendant again lied about his travel plans and stated he did not know Hamza Ahmed.  Later in the interview, the Defendant changed his story, claiming that he met Ahmed at the Mosque and that they agreed to travel to New York together.

In another conversation recorded by Bashir, the Defendant described the November trip as follows: "but I'm going to tell you one thing though, man. When I went . . . on that . . . Greyhound . . . wallah, it was the best feeling in my life."

Repeated failures to depart to Syria did not stop the conspirators from trying to achieve their goals to join ISIL.  During the spring of 2015, the Defendant continued his involvement in the conspiracy by participating in

12

meetings to discuss future travel and the purchase of fraudulent passports.  A plan was eventually agreed upon in which the Defendant and others would drive to California to purchase fraudulent passports.  From there, they would travel to Mexico and then to Syria.  In March 2015, the Defendant was recorded saying "Yeah, I'm going to jail, I don't care."  Later, he stated "To race to Allah, {Glorious be He} to make Allah's work the most high.  There is nothing more honorable than that bro . . . Wallahi, if I get arrested before it comes, {thanks to Allay} I know what I have to do inside . . . Book your ticket to {heaven}."

On April 17, 2015, Abdirahman Bashir, Abdirahman Daud and the Defendant left for California in Daud's car.  During the drive, Bashir recorded a number of conversations.  In one, the Defendant talked about something he read about martyrs that had died in Kobane, and that two were Somali.  Once the trio reached California, they drove to a warehouse to pick up the fraudulent passports.  While inside the warehouse, the three were arrested.

The nature and circumstances of the offense clearly warrants a significant sentence.

### 2.     History and Characteristics of the Defendant

The Defendant is the eldest of seven children born in the United States to

parents that escaped the civil war in Somalia.  He was raised in a close-knit, hard-working and law-abiding family, and his family continues to support him and his younger brother Adnan who entered a plea of guilty in this case.

The Court finds that despite his supportive family and steady employment, the Defendant chose to become a terrorist.  Although he does not have a criminal history, the convictions in this case do not represent a single, impulsive act.  Rather, the Defendant's criminality involved multiple steps, over more than a year, to travel to Syria so he join and fight with ISIL.  Substantial evidence was presented at trial which demonstrated that the Defendant wholly approved of ISIL and its depraved behavior.  As noted above, he expressed his enjoyment of the ISIL propaganda videos, including one that depicts the burning alive of a Jordanian pilot captured by ISIL.  The Defendant was also recorded as saying that he was "done" with America and that he would willing return on behalf of ISIL.

The Defendant now claims that news reports and social media images of atrocities in Syria, as well as a misconception of ISIL as a legitimate opposition group, is the basis for his desire to travel to Syria.  The Court categorically rejects such a claim.  No reasonable person would believe that ISIL was an organization

14

involved in charity, the protection of innocent Syrians or the pursuit of fair government because no evidence was submitted to support such a contention.

To the contrary, the government's expert, Charles Lister, testified that al Qaeda separated from ISIL in 2014 because of the sheer brutality of ISIL's blood lust. Further, ISIL distributed and publicized a number of videos showing the beheading of hostages, the shooting of innocent civilians and the burning of a Jordanian pilot. These videos dispel any notion that ISIL was a "charitable" organization. This factor also supports a significant sentence.

In addition, to the extent that the Defendant argues his young age is a mitigating factor to be considered when imposing sentence, the Court rejects such argument.

In Miller v. Alabama, the United States Supreme Court held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." Id., 132 S. Ct. 2455, 2469 (2012). The Court found that a mandatory sentencing scheme of life in prison was unconstitutional because it did not allow the sentencing court to consider that children are constitutionally different from adults for purposes of sentencing. "Because juveniles have diminished culpability and greater

15

prospects for reform, we explained 'they are less deserving of the most severe punishments.'" Id., at 2464 (citations omitted).  In reaching this conclusion, the Court also recognized that children "lack [] maturity and [have] an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking"; are more susceptible to peer pressure and have a limited control over their own environment; and their character is not well-formed and their "actions [are] less likely to be evidence of irretrievable depravity." Id. Because of these attributes, the Court held that "the penological justifications for imposing the harshest sentence" on juveniles are diminished, "even when they commit terrible crimes." Id. at 2465.

This Court has previously addressed the issue of youth as a factor in sentencing in United States v. Robert James Jefferson.  In that case, the Court re-sentenced the defendant who had previously been sentenced to a mandatory life term of imprisonment for murders committed when he was sixteen years old, pursuant to the Miller decision.  Applying the principles set forth in Miller, and specifically as to whether the crimes of conviction involved reckless or impulsive behavior due to a lack of maturity in the Jefferson case, this Court found that

[w]hile the criminal conduct at issue here is certainly reckless, the Court

16

finds that such criminal conduct did not involve rash or impulsive behavior.  The fire bombing of the Coppage home involved planning, the creation of molotov cocktails and then waiting until dark to set the house on fire.  Jefferson had plenty of time to consider what he was doing and the consequences of starting a home on fire.  He had plenty of time to back out of the plan, but he did not do so.

United States v. Jefferson, No. 97-276, 2015 WL 501968, at * 5 (D. Minn. Feb. 5, 2015).

Applying the principles set forth in Miller in this case, the Court finds that the record does not support a downward variance from the applicable guideline range based on his young age.  First, the Defendant was not a juvenile when he committed the instant offense.  Second, there is nothing impulsive about the crimes of conviction.  The evidence at trial showed that the Defendant enthusiastically participated in a conspiracy that took place over the course of one year.  The evidence at trial also showed that the Defendant had multiple opportunities to walk away from this conspiracy, but he did not do so.  He knew what he was doing was illegal, but he chose to continue his participation in the conspiracy until the day he was arrested.

### 3. Seriousness of the Offense, Respect for the Law and Just Punishment, Deterrence and Protection of the Public

The atrocities committed by members of ISIL are well-known, and were

known to this Defendant when he made the decision to join ISIL in Syria. The

fact that the Defendant took affirmative steps to join ISIL is of paramount concern

given that four men have died in Syria as a result of this conspiracy: Douglas

McCain, Abdi Nur, Yusuf Jama and Hanad Mohallim.

The Defendant now stands convicted of serious offenses and respect for

the law and providing just punishment warrant a significant punishment. A

significant sentence is also needed for individual deterrence, given the

Defendant's persistent and long-lasting role in the conspiracy.

A thirty year sentence is justified to protect the public from Defendant's

deeply held desire to become an ISIL fighter and will deter others from

committing similar crimes.

### 4.     Unwarranted Sentencing Disparities

The government has filed reports on national terrorism sentencings from

cases around the country in which one or more defendants have been convicted

of providing, or conspiring to provide, material support and resources to the

Islamic State in Iraq and the Levant ("ISIL").

The report includes information on 26 defendants. Of these, four

defendants were convicted by a jury of charges under 18 U.S.C. §§ 956(a), 2339A

and 2339B.

      a.    **United States v. Sohiel Kabir and Ralph DeLeon, (C.D. Cal. 12-92 VAP)**

After a six and-a-half week trial, Kabir and DeLeon were convicted of multiple counts conspiracy to provide material support to terrorists, in violation of 18 U.S.C. § 2339A, conspiracy under 18 U.S.C. § 371 and conspiracy to kill officers and employees of the United States in violation of 18 U.S.C. § 1117.

Kabir was sentenced to 300 months on the conviction of conspiracy to kill officers and employees of the United States;  180 months on the material support convictions, and 60 months on the conspiracy charge, all terms to be served concurrently.  DeLeon was also sentenced to 300 months on two conspiracy to murder charges, and 180 months on the material support counts, all terms to be served concurrently.

      b.    **United States v. Nader Salem Elhuzayel and Muhanad Elfaith M.A. Badawi  (C.D. Cal. 15-60)**

The defendants in this case, Elhuzayel and Badawi, used social media to discuss ISIL and terrorist attacks, expressed a desire to die as martyrs and made arrangements for Elhuzayel to leave the United States.  Elhuzayel also had contact with ISIL operatives and supporters, including Elton Simpson, one of the

perpetrators of the May 2015 attack in Garland, Texas.  The two defendants also carried out a significant bank fraud to raise travel funds.  Both defendants were sentenced to thirty years in prison.

The Defendant asserts a life sentence is inconsistent with sentences imposed on defendants in other cases.  In support, the Defendant cites to a study by the Center on National Security at Fordham Law.  (Def. Ex. A.)  He argues that based on that study, the average sentence for defendants who have committed criminal acts similar to those committed in this case is 9.2 years.[4]

The Court notes that the Fordham study submitted by the Defendant, which found the average sentence in ISIL sentencings is 9.2 years, is misleading because that average included cases in which defendants entered into plea agreements or were given a reduction for providing substantial assistance to the government.  To avoid unwarranted sentencing disparities, the Court is to consider defendants with similar records who have been found guilty of similar

---

[4]The Defendant also argued the Court should not exclude those cases in which the defendants were convicted of less serious offenses simply because the government offered them a more lenient plea deal.  The Defendant claims that he was not offered a deal that would allow him to avoid pleading guilty to the conspiracy to murder charge.  The government responds that his claim is not true.  Prior to the issuance of the Second Superseding Indictment, all defendants, including this Defendant, were given the opportunity to plead to a charge other than the conspiracy to murder charge.  The Defendant declined to do so, and he does not deny this offer was made to him.

criminal conduct.  Because the Defendant went to trial and did not provide

substantial assistance to the government, the Court should consider only those

cases that are similar to this Defendant.

Accordingly, based on the data included in the government's reports on

national terrorism sentencing, and comparing those defendants whose records

and criminal conduct are similar to this Defendant, the Court finds that a

sentence of thirty years avoids unwarranted sentencing disparities.

5.      **To Provide Needed Educational/Vocational Training, Medical Care or other Correctional Treatment in the Most Effective Manner**

Because of the risks of re-radicalization for defendants convicted of

terrorism offenses, and the fact that no program exists, either within or outside of

the federal prison system, that meets the standards of a qualified disengagement

and deradicalization program[5], the Court finds this factor does not support a

---

[5]The Court appointed Daniel Koehler, Director of the German Institute on Radicalization and De-radicalization Studies, to conduct a risk assessment evaluation and recommendations as to intervention needs for de-radicalization for the co-defendants who entered into Plea Agreements in this and related cases.  In addition to submitting reports to the Court, Koehler testified during a two day hearing and was subjected to cross examination by the Court, the government and the defense.  Koehler has extensive experience working with individuals involved with terror groups, including Somali jihadists and violent neo-nazi extremists.  He has counseled approximately 200 cases in the last six years, and is working to develop programs for the successful de-radicalization of those involved in terrorism related cases.  Koehler has suggested that such a program should involve expert personnel in the areas of religion, psychology, education and socialization.

more substantial variance from the applicable guideline range.

      **6.**    **Conclusion**

Taking into account all of the above, the Court finds that a sentence of three hundred-sixty (360) months is sufficient, but not greater than necessary, to comply with the sentencing purposes set forth in both § 3553(a) and the relevant guidelines.

Date: December 5, 2016

s/Michael J. Davis<br>Michael J. Davis<br>United States District Court