UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

       Plaintiff/Respondent,

v.

Mohamed Abdihamid Farah,

       Petitioner/Petitioner.

**MEMORANDUM OPINION
AND ORDER**
Crim. No. 15-049 (02) (MJD)

---

       Andrew Winter, Assistant United States Attorney, Counsel for Plaintiff/Respondent.

       Jordan S. Kushner, Counsel for Defendant/Petitioner.

---

       This matter is before the Court on Petitioner's motion to vacate or correct an illegal sentence pursuant to 28 U.S.C. § 2255.  (Doc. No. 922.)   An evidentiary hearing was held on July 8 and 22, 2021, and post hearing briefs were filed on November 17, 2021 and November 29, 2021.

## I.   Background

       On May 18, 2015, Petitioner was charged in the Superseding Indictment with Conspiracy to Provide Material Support to a Designated Terrorist Organization in violation of 18 U.S.C. § 2339B(a)(1), two counts of Attempting to

Provide Material Support to a Designated Terrorist Organization in violation of

18 U.S.C. §§ 2339B(a)(1) and 2, and one count of providing a False Statement to

the FBI in violation of 18 U.S.C. § 1001.   On October 21, 2015, the Second

Superseding Indictment was filed which charged Petitioner with the additional

count of conspiracy to murder outside the United States, in violation of 18 U.S.C.

§ 956, and one count of perjury in violation of 18 U.S.C. § 1621.

The matter proceeded to trial, during which the government proved, *inter*

*alia*, the following:

> In 2014, Defendant agreed to conspire with others to join one of the most
> dangerous and violent terrorist organizations the world has ever known,
> the Islamic State of Iraq and the Levant ("ISIL").  By joining this conspiracy,
> the Defendant agreed to be part of the largest group of committed ISIL
> travelers from Minnesota; an ISIL terrorist cell that, left unchecked, could
> have caused immense destruction and the loss of many lives, both here
> and abroad.
>
> As part of this cell, the Defendant watched some of the horrific
> propaganda videos produced by ISIL.  These videos depict ISIL members
> killing innocent victims in the most violent and despicable manner, such as
> mass beheadings, shootings and in one case, a Jordanian pilot that was
> burned alive.
>
> Each member of the conspiracy took affirmative steps to travel overseas to
> join and fight with ISIL.  Some of the conspirators successfully traveled to
> Syria and joined ISIL; most of whom have since been killed.
>
> The evidence at trial clearly demonstrated that each member of the
> conspiracy knew that what they were doing was wrong.  To avoid the
> scrutiny of their families, friends and most importantly, law enforcement,

they followed the ISIL playbook, which counseled "fake it till you make it." This strategy required the conspirators to remain under the radar by going to school, working to provide financial assistance to their families, attending the Mosque, and remaining otherwise law-abiding. This strategy also provided that if confronted by law enforcement, they should loudly complain that they were being profiled because they were Muslim. In order to carry out this strategy, however, the conspirators had to lie to their parents and family, to the FBI agents investigating this case, to the grand jury and to the prosecutors.

The members of the conspiracy were deeply committed to the violent jihadist ideology of ISIL. Because of this commitment, they were **not** deterred when subpoenaed to testify before the grand jury or when they received a target letter from the United States Attorney's Office. Members were **not** deterred when physically prevented from boarding flights here in Minneapolis or in New York City in their effort to join ISIL in Syria. They were **not** deterred when confronted by their parents, grandparents or siblings.

Despite all of the obstacles put in their way, the members of this conspiracy continued the march toward their admitted objective; to be a committed jihadi warrior, and to travel to Syria to fight, kill and become a martyr.

(Doc. No. 827 (Sentencing Memorandum and Opinion at 3-5).)

On June 3, 2016, a jury found Petitioner guilty on all counts against him. Prior to sentencing, the United States Probation Office prepared a Presentence Investigation Report ("PSR") advising that the total offense level was 43 and that his criminal history category was VI, resulting in a guideline range of life imprisonment. The Court adopted the guideline range as calculated by the probation office, but varied downward and sentenced Petitioner to 360 months

imprisonment on Count 1, 180 months on Counts 2, 5 and 6, 60 months on Count 7 and 96 months on Count 9, to be served concurrently.  (Doc. No. 784 (Judgment).)  Petitioner's convictions and sentence were affirmed on appeal. United States v. Farah et al., 899 F.3d 608 (8th Cir. 2018) reh'g and reh'g en banc denied, (Oct. 12, 2018) cert. denied, 139 S. Ct. 1275 (Feb. 25, 2019).

On February 22, 2020, Petitioner filed the instant motion pursuant to 28 U.S.C. § 2255 to vacate, set aside or correct his sentence.  In this motion, Petitioner has asserted a number of claims based on ineffective assistance of counsel.

## II.    Standard of Review

Under 28 U.S.C. § 2255, "[a] prisoner in custody under sentence . . . claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence . . . or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence."  28 U.S.C. § 2255(a).  Section 2255 is intended to provide federal prisoners a remedy for jurisdictional or constitutional errors.

Sun Bear v. United States, 644 F.3d 700, 704 (8th Cir. 2011).  It is not intended to be a substitute for appeal or to relitigate matters decided on appeal.  See Bousley v. United States, 523 U.S. 614, 621 (1998); Davis v. United States, 417 U.S. 333, 346-47 (1974).

Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and, if uncorrected, would result in a complete miscarriage of justice.  A movant may not raise constitutional issues for the first time on collateral review without establishing both cause for the procedural default and actual prejudice resulting from the error.  United States v. Apfel, 97 F.3d 1074, 1076 (8th Cir. 1996) (citations omitted).  Claims of ineffective assistance of counsel may constitute the "cause and prejudice" required to excuse otherwise procedurally defaults claims.  Boysiewick v. Schriro, 179 F.3d 616, 619 (8th Cir. 1999).

## III.   Discussion

### A.    Ineffective Assistance of Counsel

Claims of ineffective assistance must be scrutinized under the two-part test set forth in Strickland v. Washington, 466 U.S. 668 (1984).  Under the Strickland

test, Petitioner must prove that: 1) counsel's representation was deficient; and 2) counsel's deficient performance prejudiced Petitioner's case. <u>Kingsberry v. United States</u>, 202 F.3d 1030, 1032 (8th Cir. 2000) <u>reh'g and reh'g en banc denied</u>, (Mar. 28, 2000).

To satisfy the first prong of the <u>Strickland</u> test, Petitioner must show that counsel's representation fell below an objective standard of reasonableness under professional norms. <u>Strickland</u>, 466 U.S. at 688. The inquiry should be whether counsel's assistance was reasonable considering all the circumstances surrounding the case. <u>Id.</u> Judicial scrutiny of counsel's performance should be highly deferential, and the general presumption is that counsel's conduct "falls within the wide range of reasonable professional assistance." <u>Id.</u> at 689.

To satisfy the second prong under the <u>Strickland</u> test, Petitioner must show that but for counsel's errors, the outcome of the proceedings would have been different. <u>Id.</u> at 691.

### 1.    Improper and Inadequate Advice Prior to Second Superseding Indictment.

Petitioner's parents retained Patrick Nwaneri to represent Petitioner prior to his arrest. (Doc. No. 1010 (Ev. Hr'g at 16).) In August 2015, Murad Mohammad filed a notice of appearance to proceed as co-counsel for Petitioner.

On March 29, 2016, the government filed a motion for inquiry regarding a possible conflict of interest involving the legal assistant working with Nwaneri, Hassan Jami.  In response to that motion, Nwaneri moved to withdraw as counsel.  The motion to withdraw was granted, and Murad Mohammad proceeded as sole counsel as of April 1, 2016.

Petitioner asserts that counsel was ineffective by failing to provide him with proper and adequate advice about his options to plead guilty prior to the government obtaining the Second Superseding Indictment that charged him with conspiracy to murder outside the United States.  Petitioner further claims that Hassan Jami provided him religious advice that interfered with his ability to make an informed decision as to whether to plead guilty to the conspiracy to provide material support charge.  Petitioner claims that from the beginning of this case, he believed he was guilty of the charges against him in the Superseding Indictment and he wanted to plead guilty.

At the evidentiary hearing, Petitioner testified that following his arrest in California, he had the opportunity to read the Superseding Indictment and he "felt like he was culpable, that I was guilty of the charges that was laid forth." (Doc. No. 1010 (Ev. Hr'g at 14).)  Upon arriving in Minnesota, he met with

Nwaneri and his legal assistant, Hassan Jami.  (Id.)  Initially, Petitioner believed that Jami was an attorney, but he later learned that he was not a licensed attorney.  (Id. at 15.)  Petitioner admitted, however, that he was aware, prior to his arrest, that Jami was an imam because he had seen him at his mosque and that he led Jummah.  (Id. at 22.)  He further testified that Jami gave him a lot of religious advice concerning prayer and provided him examples of other people who were tested, such as prophets, and how they overcame their troubles by being patient.  (Id. at 23-24.)

Shortly after the Superseding Indictment was filed on May 18, 2015, the government made clear to Nwaneri that "there was a window within which [Petitioner] had an opportunity to resolve his case with a guilty plea to the conspiracy to provide material support charge." (Def. Ex. 33 (Factual Stipulation No. 1).)  The government also made clear that if the case was not resolved within said window, it would seek a second superseding indictment with the additional charge of conspiracy to murder outside the United States which carried the potential life sentence.  (Id.)

Petitioner recalled that his first meeting with counsel on June 9, 2015 was to discuss the arraignment that would take place that day.  (Doc. No. 1010 (Ev.

Hr'g at 17).)  After the arraignment, he met with Nwaneri three times in June and once in September 2015.  (Id. at 18.)  During a meeting on June 22, 2015, Petitioner met with Nwaneri and Murad Mohammad, at which time Petitioner was told that Mohammad would be acting as trial counsel.  (Id. at 19.)  At this meeting, Petitioner asked whether he had the chance to resolve the case, because he believed he was guilty of the charged offenses.  (Id.)  Nwaneri told him that was not an option at that time.  (Id. at 21.)  Hassan Jami told him to be patient, and that he should seek God's help and good things would happen.  (Id. at 22.)  Petitioner believed that through these statements, Jami was telling him "since there wasn't an option to plead, to go forth in trial and be patient and God will see a way out for me."  (Id. at 23.)

On August 15, 2015, the government afforded Petitioner and his counsel a reverse proffer, which summarized the evidence against Petitioner to ensure he understood the case against him and to aid him in assessing whether or not to plead guilty.  (Def. Ex. 33 (Factual Stipulation No. 2).)  During the evidentiary hearing, Petitioner conceded that at this proffer meeting, the government had notified him that it intended to bring a more serious charge against him, but he could not remember if the government discussed options to resolve his case at

that time.  (<u>Id.</u> at 27-28.)  Petitioner testified that he did talk with his attorneys on

September 10, 2015, and told them "he felt like he needed to plead out so [he

could] get a lenient sentence because he felt like he was guilty." (<u>Id.</u> at 28.)  In

response, none of his legal team indicated to him that pleading guilty was an

option.  (<u>Id.</u> at 29.)  Petitioner was aware, however, that a number of his co-

defendants had pleaded guilty and that during this time he had the opportunity

to talk with his family.  (<u>Id.</u> at 32.)

Murad Mohammad also provided testimony at the evidentiary hearing.

He testified that he was added as counsel because of his trial experience.  (<u>Id.</u> at

132.)  Early in the case, Mohammad met with Petitioner at the Washington

County and Sherburne County Jails, and also spoke with him on the phone

several times.  (<u>Id.</u> 132-34.)  During these meetings or calls, Mohammad

discussed the case with Petitioner, including the evidence against him, trial

strategies, and potential penalties if convicted.  (<u>Id.</u> at 134.)

Prior to the filing of the Second Superseding Indictment, Mohammad

recalled being frustrated that other co-defendants were being offered plea

agreements, but not Petitioner.  (<u>Id.</u> at 135.)  Mohammad expressed his

frustrations with Petitioner and discussed the topic of entering into a straight

plea, and Mohammad recalled that Petitioner distrusted the procedures and process of a straight plea. (Id.) Mohammad and Petitioner also discussed what would happen if he entered into a straight plea, what his exposure was, what would happen if he went to trial and the penalties he would face. (Id.)

Mohammad also recalled that Petitioner expressed no desire to plead guilty, because he believed in his innocence, and that Petitioner was consistent in the position that he did not want to accept responsibility and plead guilty. (Id. at 137.) Nonetheless, Mohammad advised Petitioner of all of his options – and specifically explained that because the government had not provided him a plea offer, Petitioner could propose an offer to the government or he could enter a straight plea to the charges. (Id. at 138.)

As to the issue of additional charges in the Second Superseding Indictment, Mohammad testified that the government clearly put them on notice – on multiple occasions - that it intended to charge him with additional counts including the more serious charge of conspiracy to murder outside of the United States. (Id. at 140.) Mohammad also explained the new charge to Petitioner and made sure he understood how the case would be escalated. (Id.) After the

Second Superseding Indictment was filed, Petitioner "buckled down" and became more ingrained in his desire to go to trial.  (Id. at 141.)

Based on its review of the record, the Court finds Mohammad's testimony credible as it is consistent with the record in this case.  On the other hand, Petitioner's testimony is repeatedly contradicted by the record, rendering his testimony less credible.

For example, Petitioner previously stated in a declaration filed in support of his petition that "had I known that I would be facing a more serious charge, I would have been all the more intent on pleading guilty to avoid that charge." (Doc. No. 954 (M. Farah Decl. ¶ 3).)  Yet at the evidentiary hearing, he admitted that he was made aware of the more serious charge during the reverse proffer, which took place two months before the Second Superseding Indictment was filed.  (Doc. No. 1010 (Ev. Hr'g at 28).)  He also testified that he met with counsel after the reverse proffer for approximately two hours to discuss his options, which undermines his claim that that he was not given the opportunity to review the evidence against him and to discuss his options with counsel and make an informed decision about whether to plead guilty.  (Id. at 25.)

In addition, in a letter sent to defense counsel on December 31, 2015, the government memorialized prior plea discussions as follows: "during the months between your clients' arrests and the second superseding indictment, all parties engaged in settlement discussions centered on the charges contained in the first superseding indictment.  Plea Agreements were formally tendered to Hanad Musse, Zacharia Abdurahman, Adnan Farah and Hamza Ahmed – each accompanied by a deadline.  The government also invited the remaining defendants (Mohamed Farah, Guled Omar and Abdirahman Daud) to propose a plea offer to the government for our consideration."  (Defense Ex. 4/Gov't Ex. 2.) This letter further provided:

> We are confident that we can negotiate with you a plea agreement that would be approved by this office and the National Security Division.  Such a plea could include, for example, mutually-agreed upon sentencing ceilings, dismissal of some charges, and other similar matters; however, each defendant would need to enter a change of plea to the Section 956 offense.

(Id.)  This letter is consistent with Mohammad's testimony that although the government had not forwarded a plea agreement to Petitioner, it would entertain a plea offer from Petitioner.  (Id.)

Petitioner's claim that it was his wish to enter into a guilty plea early in this case is further contradicted by the statements he made before this Court at the hearing on Nwaneri's motion to withdraw as counsel and at the hearing on Murad Mohammad's motion to withdraw as counsel.  At the April 1, 2016 hearing on Nwaneri's motion to withdraw, the Court asked Petitioner a number of questions concerning his working relationship with Mohammad and whether he was comfortable proceeding to trial with Mohammad as counsel.  Petitioner informed the Court that he had full confidence in Mohammad.  (<u>Id.</u> at 33.)  The Court further allowed Petitioner to take some time to think about whether he wanted to proceed with Mohammad as counsel, and Petitioner responded "Like you don't need me to come back.  And I understand, I'm happy with Mr. Mohammad.  THE COURT:  Are you certain of that?  DEFENDANT FARAH: Yes, Sir, 100 percent."  (<u>Id.</u> at 35-36.)  The Court then gave Petitioner the opportunity to talk in chambers without the government present so Petitioner could tell the Court "anything you want to tell me."  (<u>Id.</u> at 36.)  Petitioner responded "No, sir.  There's nothing you need to know to that."  (<u>Id.</u>)  Despite the Court informing Petitioner he could meet in chambers or write a letter to the Court if he had questions or concerns, Petitioner did not inform the Court of his

wish to enter a plea of guilty.  In fact, at the hearing on Mohammad's motion to withdraw as counsel, Petitioner informed the Court that he had written letters to the Court but that he did not send them.  (Doc. No. 880 (May 9, 2016 Hr'g at 11).) When the Court asked why Petitioner did not send the letters, Petitioner responded "It's my fault."  (Id.)

Thus, contrary to Petitioner's claims, the record clearly demonstrates that prior to the filing of the Second Superseding Indictment, Petitioner had been advised of his rights to enter a plea of guilty and that he had been made aware of the evidence against him and that the government intended to file additional charges against him.  Despite being so advised, Petitioner did not enter a plea of guilty and continued to maintain his innocence.

Accordingly, the Court finds that Petitioner has failed to demonstrate that counsel provided inadequate advice about his options to plead guilty prior to the filing of the additional charge against him.  See Sanders v. United States, 341 F.3d 720, 723 (8th Cir. 2003) (finding the record did not support petitioner's claim that he would have pleaded guilty if he had been properly advised by counsel as petitioner denied his guilt throughout proceedings).

### 2.   Failure to Provide Adequate Advice Before Trial.

Petitioner also claims that at no time prior to trial was he provided any substantive information that would enable him to make an informed decision about whether to plead guilty instead of proceeding to a trial.  In support, he asserts counsel never provided him any discovery, never went over the discovery or discussed the evidence beyond one propaganda video.  Petitioner also claims that counsel did not explain the conspiracy to murder charge and the evidence that was relevant to that charge.  Although counsel urged him to plead guilty shortly before trial commenced, Petitioner believed counsel was only concerned about payment, not what was in Petitioner's best interests.

Petitioner did previously complain that he was never shown any discovery and was not able to discuss the case with counsel.  (Doc. No. 880 (May 9, 2016 Hr'g Tr. at 5-7).)  Yet, upon further questioning by the Court, Petitioner admitted that early in the case his previous counsel, Nwaneri, "came to see me regularly with the evidence and everything with the case."  (Id. at 5.)  And as previously noted, Petitioner conceded that he attended a reverse proffer, the purpose of which was for the government to explain all the evidence it had against him, and

that he discussed the reverse proffer with counsel in September 2015.  (Doc. No. 1010 (Ev. Hr'g at 26).)

At the May 9, 2016 hearing, Petitioner also explained to the Court that he wanted different counsel because after they met a couple of times, it was clear that he and Mohammad saw "different sides of the case.  He sees it as one way and I feel like it's, like it's a different way. . ."  (Id. at 6.)  Petitioner also told the Court that counsel kept pushing him to resolve the case but that he did not "feel comfortable with that plea."  (Id.)  He further admitted that counsel told him "your chances at trial is not good and that your only way out is to plead to this."  (Id. at 7.)  This exchange suggests that Petitioner did, in fact, discuss the relative merits of the case with counsel.

Mohammad testified that when he met with Petitioner at the jail prior to trial, they went over the discovery that he had, the allegations and potential penalties.  (Id. at 134.)  Mohammad further testified that he either provided Petitioner copies of discovery or viewed the discovery on Mohammad's iPad.  (Id. at 206.)  This testimony is consistent with the information Mohammad provided the Court at the May 9, 2016.  (Doc. No. 880 (May 9, 2016 Hr'g at 12-14).)

Based on this evidence, the Court finds that Petitioner has failed to demonstrate that counsel was ineffective by not providing him discovery or discussing the merits of the case with him.

The Court further finds that Petitioner cannot show prejudice, because it is clear that after the Second Superseding Indictment was filed, to resolve the case would require Petitioner to plead guilty to the conspiracy to murder charge and the record does not support his claim that he would have done so.

In a letter dated December 11, 2015, counsel for those defendants who had not yet entered a plea, presented a plea proposal to the government that provided if defendants pleaded guilty to the charge of conspiracy to provide material support to ISIL, the government would dismiss the conspiracy to murder charge. (Def. Ex. 3/Gov't Ex. 1.) The government rejected the proposal and informed defense counsel the defendants would have to plead to the conspiracy to murder charge. (Def. Ex. 4/Gov't Ex. 2.) At the evidentiary hearing, Petitioner admitted he was aware of defense counsel's proposal, and that he supported it. (Doc. No. 1010 (Ev. Hr'g at 40).) The record does not, however, demonstrate that he would have pleaded guilty to the conspiracy to murder charge at any time. In fact, his statements at the May 9, 2016 hearing to

the Court clearly indicate his refusal to plead to that charge. (Doc. No. 880 (May 9, 2016 Tr. at 7).) Accordingly, the Court finds Petitioner has failed to demonstrate the results of this case would be different had Petitioner had been better informed concerning the decision to plead guilty or go to trial.

### 3.   Inadequate Representation in the Sentencing Proceedings.

Petitioner argues that there is a reasonable probability that he would have received a lower sentence if he had adequate representation at sentencing. Petitioner claims that counsel did not provide, or show him a copy of the PSR and made no attempt to find out from Petitioner any mitigating facts relevant to his sentencing. As a result, the Court was never presented with information about Petitioner providing tutoring to children over a number of years through after school programs and community-based organizations. Petitioner could also have arranged for letters of support from family, friends or community contacts setting forth his positive contributions in the community. He claims that had he read the PSR and discussed the issues with counsel, Petitioner could have been better prepared for sentencing "so that he could have made an effective statement to the court and not been torn apart by the Judge's cross-examination." (Doc. 1025 at 27.)

19

The preliminary PSR was forwarded to counsel on August 31, 2106.  (Doc. No. 635.)  Prior to that, Mohammad and Petitioner met with the probation officer on two occasions; on June 30, 2016 and September 15, 2016.  (Doc. No. 1010 (Ev. Hr'g Tr. at 151, 217); Def. Ex. 2).)  The final PSR was completed on October 19, 2016.  (Doc. No. 686.)  Jail records indicate Mohammad again met with Petitioner on November 15, 2016 – the day before his sentencing hearing.  (Id. at 217; Def. Ex. 2.)

Mohammed testified that he gave Petitioner a copy of the PSR, reviewed it with him and talked about what would happen at the sentencing hearing.  (Id. at 151.)  They also talked about the option of providing additional information to the Court, and what type of information would be helpful and what would be hurtful.  (Id.)  Mohammad testified that he received little feedback from Petitioner, which he attributed to Petitioner not being happy about the outcome. (Id. at 152.)  Mohammad also met with Petitioner the afternoon before the sentencing hearing.  (Id. at 152-53.)  Mohammad could not recall specifically what was discussed, but he would have prepared Petitioner for what would happen at the hearing.  (Id. at 153.)

Even assuming Petitioner was given the opportunity to provide letters of support from his family and the community, the Court finds such evidence would not have resulted in a lower sentence.

As this Court made clear in its written sentencing decisions, the evidence proved that Petitioner knowingly agreed to join in a conspiracy to provide material support for one of the most dangerous and violent terrorist organizations, ISIL.  The evidence also showed that Petitioner repeatedly lied to cover up this conspiracy.  He lied to his parents and grandparents, and he lied to the grand jury and to the FBI on more than one occasions.  He also attempted to travel to Syria twice, and helped others in their attempts to join ISIL in order to engage in violent acts of terrorism.  Evidence was also submitted at trial that Petitioner laughed out loud at the mass shooting of Shia prisoners in the ISIL video "On the Prophetic Methodology" and that he attempted to theologically justify the burning alive of another prisoner.

The Court further based its sentence on many additional factors, including the inherent dangerousness of crimes of terrorism and the difficulty in deterring and rehabilitating those convicted of a terrorism offense.  The Court was also concerned about avoiding sentencing disparities.  Based on the factors

considered by the Court in imposing a sentence, there is no reasonable

probability that the Court would have sentenced Petitioner to a lower sentence if

it had received letters of support from family and the community and was made

aware of Petitioner's involvement tutoring school children.

   The Court thus finds that Petitioner has failed to demonstrate that

counsel's representation was deficient and that he was prejudiced by counsel's

performance.

### B.  Certificate of Appealability

   With regard to the procedural rulings in this Order, the Court concludes

that no "jurists of reason would find it debatable whether the petition states a

valid claim of the denial of a constitutional right;" nor would "jurists of reason . . .

find it debatable whether the district court was correct in its procedural ruling."

Slack v. McDaniel, 529 U.S. 473, 484 (2000).  With regard to the decision on the

merits, the Court concludes that no "reasonable jurists would find the district

court's assessment of the constitutional claims debatable or wrong."  Id.

**IT IS HEREBY ORDERED** that:

1.  Petitioner's Motion to Vacate, Set Aside or Correct his Sentence pursuant

    to 28 U.S.C. § 2255 [Doc. No. 922] is **DENIED;** and

2.  No Certificate of Appealability shall issue.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date:  March 17, 2022

s/Michael J. Davis
Michael J. Davis
United States District Court
